**John D. YEAGER and Thomas J. Yeager, Respondents,**

v.

**AUTO–OWNERS INSURANCE COMPANY, Appellant.**

No. C1–82–741.

Supreme Court of Minnesota.

June 24, 1983.

Reding & Votel and Terrance W. Votel, St. Paul, for appellant.

William E. Ahlberg, Apple Valley, for respondents.

SIMONETT, Justice.

This appeal raises, first, the factual issue whether the insurer complied with the mandatory offer of optional insurance coverages to its insured as required by the statute then in force, and, second, issues as to stacking of optional coverages in a commercial garage liability policy. We affirm the trial court's finding that the insurer did not comply with the requirements of the mandatory offer. As to the trial court's rulings on stacking, we reverse the ruling allowing stacking of no-fault benefits and we affirm the ruling allowing stacking of underinsured motorist benefits.

Plaintiff-respondent John D. Yeager owns a Mobil service station in Apple Valley, Minnesota, doing business as a sole proprietorship under the name Auto Repair Clinic. On October 17, 1979, Mr. Yeager's minor son, plaintiff-respondent Thomas J. Yeager, was severely injured in a two-car accident while riding as a passenger in one of the cars. Neither car involved in the auto accident was in any way connected with Yeager's service station business and both cars had liability insurance but with policy limits apparently inadequate for Thomas' injuries. Thomas and his father have sued the owners and drivers of the two cars, and that suit is pending.

This declaratory judgment action is brought by John and Thomas Yeager, as plaintiffs, against the father's insurance company, defendant-appellant Auto-Owners Insurance Company, to determine what no-fault coverages and underinsured motorist coverages are applicable to Thomas' injuries. At the time of the auto accident, Thomas, age 17, lived at home with his parents and did not own a car. It is undisputed Thomas is an insured under the no-fault coverages of his father's policy.

In October 1978 Auto-Owners issued to John D. Yeager doing business as Auto Repair Clinic its commercial multiperil policy containing a garage liability section. The policy period was from October 15, 1978, to October 15, 1979, and the policy was subsequently renewed. The garage liability section afforded coverage for bodily injury and property damage liability for both motor vehicles and premises operations, plus basic no-fault benefit coverage and premises medical pay coverage, as well as uninsured motorist coverage. The no-fault coverage included the basic medical expense benefits of $20,000 and economic loss benefits of $10,000. The bodily injury liability limits were $100,000 each person, $300,000 each occurrence. The policy contained no endorsement for underinsured motorist coverage. At the time of the accident, the policy provided coverage for seven motor vehicles owned by the named insured.

At trial, Auto-Owners strenuously maintained that Thomas Napier, the independent agent who had sold the insurance to plaintiff John Yeager, had orally explained in detail to Mr. Yeager the availability of optional coverages and that Mr. Yeager had declined to purchase them. The trial court, however, found that the insurer's agent had not made an adequate offer of the optional coverages and, therefore, pursuant to Minn. Stat. § 65B.49, subd. 6 (1978) (repealed in 1980), added to the garage liability section of Mr. Yeager's multiperil policy with Auto-Owners, by imposition of law, the additional, optional coverages of $20,000 no-fault medical expense benefits and $100,000

underinsured motorist coverage. In addition, the trial court ordered stacking of coverages as follows: (1) the basic no-fault coverages written in the policy of $20,000 medical expense and $10,000 income loss were stacked seven times for the seven vehicles covered by the policy; (2) the optional medical expense coverage of $20,000 imposed by law for failure to offer to the insured was stacked seven times; and (3) the underinsured motorist coverage of $100,000 imposed by law was likewise stacked seven times.

Auto-Owners appeals. It raises three issues, namely: (1) Was the trial court's finding that the insurer had not made an adequate offer of optional coverages clearly erroneous? (2) Should the no-fault benefits, whether written in the policy or imposed by law, be stacked when these coverages are contained in a garage liability policy where the premium cost is based on payroll, not on the number of vehicles involved? and (3) May the no-fault coverages and the implied-by-law underinsured motorist coverage be stacked where the policy is a commercial policy?

### I.

■ Minn.Stat. § 65B.49, subd. 6 (1978), repealed in 1980, required insurers to offer optional coverages, including medical expense benefits subject to a maximum payment of $20,000 and underinsured motorist coverage at least equal to the insured's residual liability limits. The trial court found that Auto-Owners' agent, Thomas Napier, had not offered these coverages to John Yeager. We cannot say that the trial court's finding was clearly erroneous and we therefore affirm that finding.

■ Our case law is clear. The offer of optional coverages can be made either in writing or orally, but the burden of proving the offer and its adequacy is on the insurer. *See Holman v. All Nation Insurance Co.,* 288 N.W.2d 244, 249 (Minn.1980). The insured must be given "enough information to make an intelligent decision about optional coverages." *League General Insurance Co. v. Tvedt,* 317 N.W.2d 40, 42 (Minn.

1980). In *Hastings v. United Pacific Insurance Co.,* 318 N.W.2d 849 (Minn.1982), we identified four factors, three of which (since the offer here was oral, not written) are relevant here, to be used in examining the adequacy of a mandatory offer. They are that the insurer specify the limits of optional coverages; that it "intelligibly advise the insured of the nature of the optional coverage"; and, finally, "that the insured be apprised that optional coverages are available for a relatively modest increase in premiums." *Id.* at 852–53.

Here, not surprisingly, some 3 years after coverage was purchased and with the matter in litigation, the agent and the customer each recalls what happened differently. Both testified that in the fall of 1978 John Yeager switched his insurance business to Thomas Napier. They met three times. At the first meeting the agent, Napier, gathered information about Yeager's business. At the second meeting several weeks later, Napier went over his tentative proposal. The third meeting occurred when Napier delivered the policies. In addition, there were several phone calls between the first and second meetings. A year later, when the policy came up for renewal, the parties again talked about coverage. At these meetings Napier testified that he followed his customary "format" and explained in detail the various coverages and their cost, including the optional coverages at issue here. Napier testified that the optional coverages were not written up in his proposal because Yeager chose not to order them. Napier says Yeager wanted to reduce premiums and Yeager admitted he sought "the lowest premium and still have coverage that would keep [me] out of trouble." Yeager testified at trial that the agent had never discussed PIP benefits, medical expense benefits, income loss benefits or underinsured motorist coverage, although in his pretrial deposition he recalled discussing PIP coverage at the second meeting. To hold down costs, it appears Yeager elected to carry no collision coverage on his business vehicles and no burglary or crime insurance, and he took a $500 deductible on

his collision coverage, as well as a "CB exclusion" from his broad form auto coverage. Napier testified that Yeager said he believed that to provide employees' medical benefits arising from vehicular accidents would be to duplicate workers' compensation benefits. Yeager's premium for the total insurance package he purchased was $4,265.90, paid with a loan from a premium finance company.

As we noted in *Holman*, it is characteristic of insurance customers that they want to spend as little as possible, so that fact alone does not, of course, establish that an insured has declined optional coverages. 288 N.W.2d at 250. Yeager testified that it was not until March of 1980 that he was aware his policy did not have underinsured motorist coverage or optional medical expense coverage. Napier had no business records to substantiate his recollection that he had offered the optional coverages. Since the agent's recollection of what he offered Yeager would be an adequate offer under the *Hastings* standard, the issue was really whether that offer had been made. This was a fact issue for the trial court to resolve, and it is not for us, on this record, to disturb that finding. Neither do we think there is any merit to appellant's argument made on appeal that somehow, on this record, Yeager is estopped or has waived his claim that optional coverages are to be added to his policy.

## II.

The next issue is whether the no-fault coverages for medical expenses and income loss may be stacked. The trial court permitted stacking. We disagree and reverse this ruling.

It should be kept in mind that Auto-Owners' policy, as written, contained basic no-fault benefits of $20,000 medical expense coverage and $10,000 economic loss benefits. In addition, because the trial court found no offer had been made to Yeager for the additional $20,000 medical expense coverage, this coverage is added to the policy as a matter of law. The district court permitted stacking on the seven motor vehicles Yeager owned at the time of his son's auto accident.

First, we examine the manner in which the insurance was written and the premium cost calculated. As a result of Napier's negotiations with John Yeager, Auto-Owners issued three policies to Yeager: a workers' compensation policy, the commercial multiperil policy already mentioned, and an auto physical damage policy with comprehensive and collision coverages. Each of these policies is a separate document with a separate policy number.

The multiperil policy has several declaration sheets corresponding to the different component coverages, such as personal property, loss of earnings, fire legal liability, glass, and—most relevant here—garage liability ("Garage Hazard I"). Garage Hazard I includes coverage for bodily injury liability, property damage liability, personal injury protection (*i.e.,* "PIP" no-fault medical expense and economic loss protection), as well as premises operations liability. It is important to note that the premium for each of these coverages, including the no-fault benefits, is based on a premium rate applied to each $100 of insured's payroll, subject to an annual premium audit. In other words, the premium is a function of the payroll and is not related to the number of motor vehicles covered. Thus the policy declarations for garage liability do not list or describe Yeager's motor vehicles, nor for the purpose of "no-fault" coverage is there any need to do so.[1]

It is Auto-Owners' position that the no-fault coverages cannot be stacked for the seven vehicles owned by John Yeager because there are no separate coverages for

---

1. On the other hand, the premium for uninsured motorist coverage, which was also included in Auto-Owners' garage liability coverage, is based on a per-vehicle charge, and the declarations sheet shows the number of vehicles covered for the purpose of uninsured motorist coverage (in this case, seven). The evidence at trial was that if an endorsement for underinsured motorist coverage had been added to the policy, the premium for that coverage would likewise have been based on a per-vehicle cost.

each vehicle with a separate premium for each vehicle and, therefore, nothing to stack. We agree.

Previous stacking cases always involved either separate policies or separate coverages within one policy. In *Wallace v. Tri-State Insurance Co.*, 302 N.W.2d 337, 339 (Minn.1980), we recognized that one of the prerequisites to stacking of basic economic loss benefits is that "the injured person must be an insured under two or more policies of no-fault insurance applicable on the same priority level * * *." In *Wasche v. Milbank Mutual Insurance Co.*, 268 N.W.2d 913, 919 (Minn.1978), we held that "the injured person shall be allowed to recover basic economic loss benefits under each no-fault coverage applicable to him as an insured to the extent of actual losses * * *," and we also said, *id.* at 920, that "a clause in an insurance policy purporting to preclude stacking of no-fault coverages *for which separate premiums have been paid* must be declared void * * *." (Emphasis added.) Similarly, in *Koons v. National Family Insurance Co.*, 301 N.W.2d 550, 553 (Minn.1981), we said, "Benefits are stacked because the policyholder is paying on more than one policy for protection of persons insured under those policies."

■ The rationale behind stacking is twofold: the legislature requires certain coverages in all policies; and, second, a premium having been paid for that coverage, the insurer is not to receive a windfall in premiums paid for coverage not honored. *Van Tassel v. Horace Mann Mutual Insurance Co.*, 296 Minn. 181, 187, 207 N.W.2d 348, 351–52 (1973); *Peterson v. Iowa Mutual Insurance Co.*, 315 N.W.2d 601, 602 (Minn.1982); *Weiss v. Farmers Insurance Group*, 302 N.W.2d 353, 355 (Minn.1981); *Koons v. National Family Insurance Co.*, 301 N.W.2d 550, 553 (Minn.1981). Of course, the fact that several motor vehicles are covered in one policy rather than in separate policies does not preclude stacking, so long as separate coverages have been purchased. In *Holman v. All National Insurance Co.*, 288 N.W.2d 244, 251 (Minn. 1980), we rejected the insurer's argument that stacking should be denied because economic loss coverage for two vehicles was contained in one policy, saying, "We cannot accept this contention. Lawrence Holman paid premiums for the basic economic loss coverages required by the Minnesota No Fault Act for both vehicles."

What makes this case different from our prior stacking cases is that here we do not have separate coverages paid for by a separate premium for each vehicle, such as one finds in the usual family policy purchased by a policyholder to cover himself and members of his household. Instead, we have a commercial policy covering a business with family protection included therein, but with the policy premium computed on a payroll basis. Clearly, each of Yeager's seven vehicles is covered for no-fault benefits under this hybrid policy but the question is whether these benefits, when paid to an individual, are to be deemed multiple coverages for stacking purposes. Our cases speak of allowing stacking of coverages "for each vehicle" while at the same time saying that no-fault benefits cover the person not the vehicle; in *Koons,* however, we elaborated on the considerations involved:

> The *Wasche* decision clearly indicated that no-fault benefits cover the person and not the vehicles. 268 N.W.2d [913] at 918. Benefits are stacked because the policyholder is paying on more than one policy for protection of persons insured under those policies. The statute mandates that such personal coverage be purchased for each vehicle owned or principally garaged in the state. Minn.Stat. § 65B.48 (1978). The risk being insured by each policy issued to an insured party is principally the risk of injury to himself or covered members of his household. The number of vehicles owned or policies issued does not increase the risk. The carrier or carriers are adequately compensated for providing no-fault coverage under each policy. The premiums paid to insurers for each policy containing no-fault benefits separately reflect the risk to the insured party.

*Koons v. National Family Insurance Co.,* 301 N.W.2d 550, 553 (Minn.1981).

Here the risk principally being insured against is the risk of injury to the named insured and his employees in the business. The premium paid to cover this risk takes into account the fact that an employee injured while a passenger or driver in a vehicle furnished by the employer comes within a priority level which disallows stacking. *See* Minn.Stat. § 65B.47, subd. 2 (1982). It is because the principal risk is a business risk rather than a family risk that the premium is calculated on the degree of the named insured's business activity as measured by the payroll generated by the business. This premium includes but does not separately reflect the secondary risk of injury to the named insured and members of his household in their family pursuits. In this context, then, it is appropriate to say that there is only a single policy or single coverage for which only a single premium was paid even though several vehicles are involved. Consequently, when an insured under the policy, either a household member or a business employee, is injured, the single payment of benefits does not result in an unearned premium windfall to the insurer. There is nothing to stack because, in the words of *Wasche,* there is only the single "no-fault coverage applicable to him as an insured." 268 N.W.2d at 919.

Perhaps the insurer and the policyholder could have bargained for a different kind of insurance package, separate policies with a different premium structure which would have resulted in stacking. Thus plaintiff-respondents argue that John Yeager was presented with a complicated insurance package proposal for his business and that he "was not intelligibly advised of the basis for determining the premiums for basic economic loss coverages." From this premise, respondents argue, if we understand them correctly, that the insurance agent's proposal did not meet the *Hastings* standards for an adequate offer under section 65B.49, subd. 6, and, therefore, stacking should be allowed. This argument misses the mark. The requirement of an adequate offer goes only to the narrow issue whether, under our statute, optional coverages are to be added to the policy; it has nothing to do with whether such coverages, once found to exist as an amendment to the policy, may be stacked, or with the question of what kind of insurance policies should have been considered by the parties in the first instance.

We hold that neither the no-fault benefits as written in the policy nor the optional medical expense coverage implied by law here can be stacked, since in both instances the premium charge does not reflect separate coverages for the risk involved.

### III.

This brings us to our third issue: May the implied-by-law *underinsured* motorist coverages in Auto-Owners' garage liability policy be stacked? We hold that they can be.

The evidence at trial was that if an endorsement for underinsured motorist coverage had been added to the policy, the premium for that coverage would have been based on a per-vehicle cost of $15 per vehicle. Therefore, Auto-Owners cannot avoid stacking of underinsured motorist coverage on the basis of no separate premium reflecting the risk for the persons insured. Auto-Owners does not dispute that once the trial court's finding of no adequate offer of optional coverages has been affirmed underinsured motorist coverage is, by implication of law, added to its policy issued to Yeager. Further, it is settled law that when underinsured motorist coverage is implied because of the insurer's failure to make the mandatory offer, such coverage may be stacked just as other first person coverage may be stacked. *Holman v. All Nation Insurance Co.,* 288 N.W.2d 244, 251 (Minn.1981).

Here, however, Auto-Owners asserts that stacking of the underinsured motorist coverages should not be allowed because its policy is "clearly of a commercial nature, providing coverage to commercial vehicles." There is no statute defining a commercial

policy or distinguishing it from other plans of auto reparation security. Nevertheless, Auto-Owners argues that a distinction should be made, pointing out that a commercial policy potentially covers "a multitude of vehicles." Auto-Owners says that to allow stacking would be to make premium costs prohibitively expensive and would not be within the reasonable expectations of the insurer and the employer-policyholder, citing cases from other jurisdictions, including *Lambert v. Liberty Mutual Insurance Co.,* 331 So.2d 260 (Ala.1976) (employee denied stacking of uninsured motorist coverage in a fleet policy covering 1,699 vehicles); *Linderer v. Royal Globe Insurance Co.,* 597 S.W.2d 656 (Mo.App.1980) (employee denied stacking of underinsured motorist coverage for a fleet of 1,420 vehicles). We decline, however, to address a question that is not before us. We do not have here a large, commercial fleet policy. Assuming arguendo there is validity to the arguments about prohibitive costs and reasonable expectations, these arguments have no force here.

Auto-Owners also argues that if stacking is to be permitted a distinction should be made between those vehicles owned by the named insured used for business and those devoted to personal use, and that the underinsured motorist coverages for only those vehicles devoted to personal use—here two, possibly three of the seven vehicles—should be stacked. It seems to us, however, aside from the myriad fact disputes that would be engendered in sorting out the vehicles, that the use to which the vehicle is put bears no meaningful relationship to the question of whether the underinsured motorist coverages that were purchased for each vehicle should be stacked. "It is well-established that first party coverages for which the insured pays a premium follow the person, not the vehicle," *American Motorist Insurance Co. v. Sarvela,* 327 N.W.2d 77, 79 (Minn.1982) (footnote omitted) (underinsured motorist coverages). Since the coverage does not follow the vehicle, neither does it follow the use to which the vehicle is put.

We hold that the implied underinsured motorist coverages for all seven motor vehicles in this garage liability policy, for which a per-vehicle premium would have been charged had the mandatory offer been made and accepted, may be stacked for all vehicles covered by the policy regardless of whether the vehicles were used for family or business purposes.

Affirmed in part and reversed in part.