573 So.2d 646 (1990)
Minor HARRIS, Jr., Magnolia Hotel Company, The Travelers Indemnity Company and Shelter Insurance Companies
v.
Linda H. MAGEE.
Nos. 07-CA-59126, 07-CA-58843.
Supreme Court of Mississippi.
May 30, 1990.
Rehearing Denied January 23, 1991.
*647 J. Price Coleman, Trudy D. Fisher, Daniel Coker Horton & Bell, William C. Griffin, Steen Reynolds Dalehite & Currie, Jackson, for appellant.
Cotton Ruthven, Waller & Waller, Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and SULLIVAN and PITTMAN, JJ.
SULLIVAN, Justice, for the Court:
This cause involves two appeals consolidated for review by this Court. Each arises from a wrongful death suit filed in the Circuit Court of the First Judicial District of Hinds County, Mississippi, the Honorable Fred L. Banks, Jr., presiding. At the trial level, summary judgment was entered in favor of the plaintiff and against the decedent's uninsured motorist carrier, Shelter Insurance Company, in the sum of $50,000.00. The case proceeded to trial against Travelers Indemnity Company, uninsured motorist carrier for the decedent's employer. On the issue of liability, the trial court directed a verdict in plaintiff's favor. As to damages, the jury rendered *648 judgment against Travelers Indemnity Company and in plaintiff's favor for $549,000.00 of which $525,000.00 was entered against Travelers. Subsequently, the trial court ruled that the amount of uninsured motorist coverage provided by Travelers was $10,000.00 per vehicle, not $25,000.00, thereby reducing the maximum limit of uninsured motorist coverage to $210,000.00. It is from these judgments that these appeals were taken. Appellant, Travelers, assigns the following, as issues to be addressed:
1. Whether the deceased, Richard Larry Magee, was an insured under the Travelers commercial automobile policy;
2. Whether the testimony of the investigating police officer concerning what he was told regarding the decedent's intentions as he was crawling from under the crane should have been admitted as an excited utterance exception to the hearsay rule;
3. Whether the deceased, Richard Larry Magee, as a Class II insured, permissive user, was entitled to stack uninsured motorist benefits under his employer's policy;
4. Alternatively, if Richard Larry Magee is entitled to stack uninsured motorist benefits, whether only vehicles in the policy and not trailers may be stacked; and
5. Alternatively, if stacking is allowed, whether Travelers, as workers' compensation carrier, is entitled to a credit for workers' compensation benefits paid on behalf of Richard Larry Magee.
As cross-appellant, Linda H. Magee assigns as issues to be addressed:
6. Whether a regular driver of an insured vehicle under a corporate business policy is a named insured; and
7. Whether Travelers is liable for $25,000.00 uninsured motorist's coverage for each vehicle covered by its policy rather than the $10,000.00 statutory minimum.
In addition to issues 3 and 5 above, Shelter addresses the following issue:
8. Whether uninsured motorist coverage on the vehicle is primary as compared to the uninsured motorist coverage on the injured or deceased person.

FACTUAL SETTING
The decedent, Richard Larry Magee (Larry), was employed by Pearl Steel Erectors, Inc. (Steel). On the morning of July 1, 1985, a crew from Steel was dispatched from their Pearl, Mississippi, office to work at a job site in Vicksburg, Mississippi. One worker was assigned the task of driving a self-propelled P & H Crane to the Mercy Hospital job site in Vicksburg. Because the crane travelled at a slow rate of speed, it departed from Steel's office before the rest of the crew. The remaining job crew travelled to Vicksburg in three of Steel's trucks. J.W. Bounds drove an El Camino with his grandson, Mike Bounds, as a passenger. Mark Threet drove a blue Chevy Bonanza with John Loveland as his passenger. Larry drove a white GMC truck. All three of these trucks were insured under a business auto policy issued by Travelers Indemnity Company (Travelers) through the assigned risk plan. See Miss. Code Ann. § 63-15-65, (Supp. 1989). The parties stipulated that the P & H Crane was not insured by Travelers.
Enroute to the job site, the crane encountered mechanical difficulties and pulled over on the north shoulder of the west bound lane of Interstate 20, about one-half mile west of the Natchez Trace exit. Coming upon the disabled crane, J.W. pulled over, parking the El Camino in front of the crane on the north shoulder of the highway. Mark parked the Chevy Bonanza behind the crane. Larry parked the GMC truck behind the Bonanza, about 75 feet from the crane. He exited the GMC truck, shut the door and walked to the crane.
Larry and two other workers crawled beneath the crane to determine if the crane could be repaired. As Larry was crawling from beneath the crane, he was struck by a van driven by an uninsured motorist, Minor Harris, Jr. The force of the impact hurled Larry's body back underneath the crane. Approximately 24 hours later, Larry died as a result of injuries sustained in this accident.

INSURANCE COVERAGE
At the time of the accident, Travelers, through Mississippi's assigned risk plan, *649 provided automobile liability coverage to Steel through a business automobile policy which insured Steel's 22 vehicles. Travelers was also the workers' compensation carrier for Steel and has paid $58,000.00 on Larry's behalf in workers' compensation death benefits, funeral expenses and medical expenses.
Larry owned three automobiles. Linda Magee (Linda), the decedent's wife, argued that all three of these automobiles were covered by personal policies issued by the Shelter Insurance Companies (Shelter). Shelter avers that they insured only two of these vehicles because coverage on the third had been cancelled. Linda filed for summary judgment on the uninsured motorist coverage under all three of these autos. Shelter admitted coverage under two of the automobiles for a total of $50,000.00 in benefits but argued that this was excess coverage. On November 25, 1987, the trial court granted summary judgment in Linda's favor and against Shelter in the amount of $50,000.00 (disregarding the claim for benefits under the third policy, which was settled by agreement). Because of competing claims for this sum, the trial court ordered it paid into the registry of the court for disbursement. Shelter complied with this order and was absolved of liability for this $50,000.00 by order of the court.
As to the Traveler's policy, the trial court determined that the maximum amount of available uninsured motorist coverage was $550,000 ($25,000/single limit coverage X 22 covered vehicles). The court then reduced this amount by $25,000 in settlement of a claim on behalf of a co-employee of Larry's, who was also killed in the accident. The jury was instructed that its verdict against Travelers could not exceed $525,000.
The case went to trial against Travelers on whether Larry was "using" an insured vehicle, for insurance purposes, at the time of the accident. The trial court instructed the jury to peremptorily return a verdict in favor of the plaintiff and the jury only deliberated the issue of damages. The jury returned a verdict of $549,000.00 of which $525,000.00 was entered against Travelers. (21 vehicles X $25,000.00/vehicle coverage). Subsequently, the trial court determined that because the uninsured motorist coverage was imputed by statute, the statutory minimum of $10,000.00 per vehicle applied instead of $25,000.00 per vehicle. Accordingly, the maximum coverage for Larry was $210,000.00. The trial court also ruled that Travelers, as workers' compensation carrier, was not entitled to credit, subrogation or reimbursement for the workers' compensation benefits it had paid.

I.

DID THE TRIAL COURT ERR IN DETERMINING THAT LARRY MAGEE WAS "USING" THE INSURED VEHICLE FOR THE PURPOSES OF UNINSURED MOTORIST COVERAGE?
For its initial assignment of error, Travelers submits that because Larry was not "occupying" or "using" the insured vehicle at the time of the accident, he was not an "insured" under the Travelers' policy. They contend:
(1) that because the evidence was uncontradicted that Larry was not "occupying" the vehicle at the time of the accident, the trial court erred in not directing a verdict in their favor; and,
(2) in the alternative, because a factual issue existed regarding the decedent's intentions when he was crawling from underneath the crane and was struck by the uninsured motorist, the trial court erred in directing a verdict in favor of the decedent's beneficiary on the coverage issue.

Policy Terms
Travelers' position rests entirely upon policy language. The relevant portion of the Travelers' policy is found in the uninsured motorist section and reads, in part:
A. WORDS AND PHRASES WITH SPECIAL MEANING ...
2. "Occupying" means in, upon, getting in, on, out... or off ...
B. WE WILL PAY
1. We will pay all sums the insured is legally entitled to recover from the *650 owner or driver of an uninsured motor vehicle ...
D. WHO IS INSURED
1. You or any family member.
2. Anyone else occupying a covered auto.
Without question, the trial record supports Travelers first contention that Larry was not "occupying" the insured vehicle at the time of the accident. Linda does not contest this point. As to Travelers' alternative position, that a factual issue existed concerning Larry's intentions when crawling from beneath the crane, this posture is relevant only in analyzing whether he was in the process "getting in" the vehicle at the time of the accident in conformity with policy terms. If our analysis stopped with the policy definition of "insured", both of these arguments would have merit. However, our analysis goes beyond the terms of the policy. Only if the statutory definition of "insured" were disregarded would Travelers have been entitled to a directed verdict.

Statutory Terms
Travelers' argument ignores the clear language of Miss. Code Ann. § 83-11-103(b), (Supp. 1990), which states, in part:
The term "insured" shall mean the named insured and, while resident of the same household, the spouse of any such named insured and relatives of either, while in a motor vehicle or otherwise, and any person who uses, with the consent, expressed or implied, of the named insured, the motor vehicle to which the policy applies. (Emphasis Added).
Both parties cite Stevens v. U.S. Fidelity & Guaranty Co., 345 So.2d 1041 (Miss. 1977). In that case, Stevens, a wrecker operator, responded to an emergency call to remove a truck which had been involved in a traffic accident from the highway. After removing the disabled vehicle, he exited the wrecker and began to sweep debris from the roadway. As he was returning to the wrecker, Stevens was struck by an uninsured motorist. He filed suit against his employer's uninsured motorist carrier. The policy covered the business vehicles owned and operated by his employer. As part of its analysis, this Court said:
The lower court felt that at the time of his injury Stevens was so far removed from his insured vehicle as to prevent him from being included within the definition of insured contained in the terms of the policy, but apparently the court did not consider the definition of insured contained in the Mississippi Uninsured Motorist Coverage Act... .
The terms and provisions of the Mississippi Uninsured Motorist Coverage Act are written into every automobile liability policy issued in the state... .
345 So.2d at 1042 and 1043.
In the case at hand, the lower court correctly supplemented the policy definition of "insured" with the statutory definition. Based upon the evidence presented, the trial court determined that Larry was "using" the insured vehicle at the time of the accident and directed a verdict in Linda's favor on this issue.

Scope of Review
The scope and extent of this Court's review of a directed verdict is well known. We are required to "compare the evidence elicited on direct examination with that produced on cross-examination, determine what, if any, facts were uncontradicted in the proof, and consider all of the evidence together with all favorable inferences reasonably to be drawn from the evidence in light most favorable to [the party against whom that verdict was rendered]." Mississippi Farm Bureau Mut. Ins. Co. v. Todd, 492 So.2d 919, 928 (Miss. 1986).
The record reveals:
(1) The GMC truck was assigned for Larry's use;
(2) Larry, as job foreman, was expected to assist in repairing the crane and was in charge of the crew which was under the crane;
(3) The GMC truck was set up to carry materials used on the job and tools which could be used to repair the crane were kept on the truck;
*651 (4) When Larry was struck by the van, Mark Threet was looking in Larry's truck for a bolt or pin to use in repairing the crane;
(5) Because somebody from under the crane told Mark to locate a 3/8 inch bolt, he went to Larry's truck to look for one;
(6) Five to ten minutes elapsed between the time that Larry had parked his truck on the highway shoulder and the time that he was struck by the van.
The uninsured motorist statute is to be liberally construed so as to provide coverage. Washington v. Georgia American Ins. Co., 540 So.2d 22, 25 (Miss. 1989); Wickline v. U.S. Fidelity & Guar. Co., 530 So.2d 708, 711 (Miss. 1988); Stevens v. U.S. Fidelity & Guaranty Co., 345 So.2d 1041, 1043 (Miss. 1977). The purpose of the uninsured motorist statute is to give the same protection to the person injured by the uninsured motorist as the injured party would have if injured by an insured person.
It is uncontradicted that Larry used the truck to accompany his workers to job sites. It is undisputed that directing and assisting his co-employees in repairing a disabled vehicle that was crucial to the performance of their job was a necessary part of Larry's duties as a foreman. Larry could only accomplish this part of his job by removing himself from the truck. It cannot be said that temporarily exiting the vehicle constituted an abandonment of its use.
Our previous decisions in Stevens and Cossitt v. Nationwide Mut. Ins. Co., 551 So.2d 879 (Miss. 1989), mold our holding today. In each instance, the accident occurred in close spatial proximity to the insured vehicle. Further, in all cases, employees had only recently exited the vehicles. Third, both Stevens and Larry were performing duties directly related to the use of the insured vehicles when they were struck by uninsured motorists.
Stopping to repair the crane was a necessary aspect of the truck's operation. The evidence presented conclusively indicates that the truck was being used by Larry and his crew to repair the crane. On this point no rational juror could disagree and the trial court's directed verdict should be affirmed.

II.

DID THE TRIAL COURT ERR IN ALLOWING THE INVESTIGATING OFFICER'S TESTIMONY AS AN EXCEPTION TO THE HEARSAY RULE?
Travelers argues that the lower court committed reversible error by allowing a portion of Sergeant Bullock's testimony into evidence. Linda avers that the disputed testimony was a Rule 803(2) Excited Utterance, an exception to the hearsay rule.
Approximately two hours after the accident, Sergeant Bullock interviewed three eyewitnesses, Mike Bounds, Mike McGowan and Mark Threet, at the Clinton police station. He testified, over Travelers' objection, that one of these witnesses told him that the decedent was in the process of crawling from underneath the crane to select a part or tool needed to repair the crane. In overruling Travelers' objection, the trial court pointed out that it was not unreasonable to believe that these eyewitnesses would still be in an excited state some two hours after seeing two co-workers killed. The lower court ruled that this statement was admissible as an excited utterance and an exception to the hearsay rule.
Travelers argues that because the statements were made two hours after the accident, the declarants were not under the stress and excitement of the accident but were engaged in a reflective thought process. The comments to Rule 803(2) state that "[W]ith respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly."
The trial record is replete with substantial additional evidence which establishes that Larry was "using" an insured vehicle(s) at the time of the accident. Even if the lower court's ruling were wrong, the error was not of such magnitude as to *652 undoubtedly prejudice Travelers and, as such, would only constitute harmless error, which is not a basis for reversal. See Davis v. Singing River Elec. Power Ass'n., 501 So.2d 1128, 1131 (Miss. 1987). This assignment of error is without merit.

III.

DID THE TRIAL COURT ERR IN ALLOWING A SECOND CLASS PERMISSIVE USER TO STACK UNINSURED MOTORIST BENEFITS UNDER HIS EMPLOYER'S POLICY?
This Court, in interpreting our UM statute, has recognized, as a general rule, that all classes of statutory insureds are allowed to stack uninsured motorist coverage. See Wickline v. U.S. Fidelity & Guar. Co., 530 So.2d 708, 715 (Miss. 1988). As there are no statutory distinctions between the various types of auto policies in our UM statute, this Court refuses to distinguish them jurisprudentially. Travelers contends that Class II insureds should not be allowed to stack in situations involving policies covering large commercial fleets. To this end, Travelers argues that the trial court erred in allowing Linda to stack coverage (21 vehicles X $10,000.00/vehicle) because "the instant case involves a commercial fleet policy." For precedential authority, Travelers cites a number of cases from other jurisdictions which have refused to allow Class II insureds to stack commercial fleet policies.
"[I]n dealing with the question of whether a claimant-employee should be permitted to stack the coverages provided under a commercial fleet policy insuring several vehicles for which separate premiums were paid, the courts are virtually unanimous [in refusing to allow stacking]." Howell v. Harleysville Mut. Ins. Co., 305 Md. 435, 439, 505 A.2d 109, 111 (1986). A review of other jurisdictions seems to confirm this view. See Aetna Cas. and Sur. Co. v. Craig, 771 P.2d 212 (Okla. 1989), (Employees, as Class II insureds, are only entitled to the coverage afforded by the particular vehicle occupied when injured and could not stack coverage for all vehicles covered in a fleet insurance policy); Stanton v. American Mut. Liability Ins. Co., 747 P.2d 945 (Okla. 1987), (Class II insured could not stack uninsured motorist coverage for all of employer's 379 vehicles insured under employer's fleet policy but was entitled to coverage provided for the vehicle he was driving at the time of the accident); Howell v. Harleysville Mut. Ins. Co., 305 Md. 435, 505 A.2d 109 (1986), (Class II insured was not entitled to stack commercial fleet policy which insured 19 vehicles.); Murphy v. Milbank Mut. Ins. Co., 388 N.W.2d 732 (Minn. 1986) (Class II insured, a corporate employee, could not stack under fleet policy covering employer's 2,000 vehicles. One must be an insured of all vehicles in order to stack coverage. Since employee was insured only by virtue of his occupancy in one vehicle, he was only insured as to that vehicle); Fuqua v. Travelers Insurance Company, 734 F.2d 616 (11th Cir.1984), (Automobile dealer's employee, a Class II insured, was not allowed to stack uninsured motorist coverage of 27 "dealer plate" automobiles which were insured under the same commercial fleet policy); Burke v. Aid Ins. Co., 487 F. Supp. 831 (D.C.Kan. 1980), (Class II insureds were not allowed to stack commercial fleet policy which insured 44 vehicles); Ohio Casualty Ins. Co. v. Stanfield, 581 S.W.2d 555 (Ky. 1979), (Class II insured was precluded from stacking uninsured motorist coverage under his employer's automobile fleet policy which covered 63 vehicles); Holloway v. Nationwide Mut. Ins. Co., 376 So.2d 690 (Ala. 1979), (Uninsured motorist coverage for employer's entire fleet of vehicles was not available to Class II insured, who was also the son of the corporation's principle stockholder, who was killed while driving one of the corporation's cars); Lambert v. Liberty Mutual Insurance Company, 331 So.2d 260 (Ala. 1976), (Insured who was insured by virtue of his occupancy of employer's vehicle under a fleet policy issued to his employer was not entitled to stack employer's 1,699 vehicles which were insured under same policy); Cunningham v. Insurance Co. of North America, 213 Va. 72, 189 S.E.2d 832 (1972), (Class II insured could not stack 4,368 state owned vehicles covered under a single fleet *653 policy). See 25 ALR 4th 896; Appleman, Insurance Law and Practice §§ 5101, 5106 (1981).
As we recognized in Cossitt v. Nationwide Mut. Ins. Co., 551 So.2d 879, 884 (Miss. 1989), the rationale most commonly cited by the majority of jurisdictions which preclude Class II insureds from stacking under commercial fleet policies compares the potential for high exposure to the premium actually paid. According to Travelers, extending stacking to commercial fleet policies has the potential to produce absurd results. Travelers urges this Court to align with these other jurisdictions and refuse to allow a Class II insured to stack under an employer's commercial fleet policy.
In reviewing these other jurisdictions, we note that their UM statutes are different from our own. While we are impressed by the volume of authority and respect their opinions, we are not persuaded to follow them. In making this determination, we have considered the following:
1. We are guided by our uninsured motorist statute, not the jurisprudence of foreign jurisdictions;
2. Throughout our jurisprudence and in the liberal rules of construction which we have compiled in interpreting our UM statute, we have consistently recognized and allowed a Class II insured to stack uninsured motorist coverage;
3. Most importantly, our legislature has not seen fit to distinguish a "commercial fleet" policy from any other auto policy. Stacking is a vital cog in our UM scheme. The legislature has not statutorily overruled our stacking decisions; therefore, we assume that stacking is not repugnant to Mississippi public policy.

Uninsured Motorist Coverage Act
Wickline, 530 So.2d at 714, directs us to the Mississippi uninsured motorist statute for guidance. Justice Prather, speaking for this Court, recognized that our uninsured motorist statute, not the decisions of foreign jurisdictions, governs our determination:
Careful study ... makes clear that this Court looked too much to the decisions of other states . .. and too little to the language of the Mississippi statute. Recognizing that the statute controlled our decisions, this Court refined and clarified this state's law.
It is now clear that the question is purely and simply one of reading the statute as written. First, who is an "insured"? There is no natural law definition of insured in uninsured motorist law, nor are we concerned with what the law ought to be. The judicial eye reads only the positive command of the statute.

Continuing with our analysis, we asked of the statute:
But can they stack?

Stacking is firmly imbedded in our uninsured motorist law. The sort of stacking sought here, i.e., stacking multiple coverages within a single policy, has been mandated... . As with other types of stacking, the rationale offered is that multiple premiums are paid and multiple (stacked) coverages should be available. However, what is important is the fact that stacking has become a positive gloss upon our Uninsured Motorist Act.

... the operative provisions of the Mississippi Uninsured Motorists Act have been declared as a matter of positive law to provide that all classes statutory insureds may recover of the UM insurer all amounts he or she may be entitled to recover as damages from the uninsured motorist, limited only by the limits of UM coverage multiplied by the number of vehicles insured in the policy. (Emphasis added, Citations omitted).
Our uninsured motorist statute provides: § 83-11-101. Automobile liability policies to contain "uninsured motorist" and property damage provisions.
(1) No automobile liability insurance policy or contract shall be issued or delivered after January 1, 1967, unless it contains an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of *654 an uninsured motor vehicle, within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law, as amended, under provisions approved by the commissioner of insurance... . The coverage herein required shall not be applicable where any insured named in the policy shall reject the coverage in writing and provided further, that unless the named insured requests such coverage in writing, such coverage need not be provided in any renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer. (Emphasis added).
In interpreting our uninsured motorist statute, and in addressing the stacking issue in particular, this Court has compiled and adopted a significant body of jurisprudential rules of construction. Uninsured motorist coverage is designed to provide innocent injured motorists a means to recover all sums to which they are entitled from an uninsured motorist. The statute is to be liberally construed so as to achieve compensation. See Washington v. Georgia American Ins. Co., 540 So.2d 22, 24-25 (Miss. 1989); Rampy v. State Farm Mut. Auto. Ins. Co., 278 So.2d 428, 431-432 (Miss. 1973). UM coverage is available to an injured insured until all sums which he shall be entitled to recover from the uninsured motorist have been recovered. See Harthcock v. State Farm Mut. Auto. Ins. Co., 248 So.2d 456, 461-462 (Miss. 1971); Stevens, 345 So.2d 1041 (Miss. 1977); Brown v. Maryland Cas. Co. 521 So.2d 854 (Miss. 1987); Wickline, 530 So.2d 708, 711-712 (Miss. 1988).

Class II Insureds Can Stack UM Coverage
In the current case, Larry was "using" a covered vehicle(s) with consent at the time of the accident and was, therefore, a Class II insured. This Court's interpretation of statutory uninsured motorist coverage has always been shaped by the template of public policy upon which this statute is based  to provide protection to innocent motorists injured by financially irresponsible drivers up to the extent of their injuries. Stevens, 345 So.2d at 1043. To this end, this Court has consistently recognized and allowed the stacking of uninsured motorist coverage by Class II insureds. See Cossitt v. Nationwide Mutual Insurance Company, 551 So.2d 879 (Miss. 1989),[1] (Class II insured/church employee was allowed to stack three policies issued to the church on the bus involved in the accident and two other buses owned by the church); Wickline v. United States Fidelity and Guaranty Company, 530 So.2d 708 (Miss. 1988), (allowed a Class II insured to stack the four vehicles insured under a single personal policy which covered the vehicle in which she was a passenger); Brown v. Maryland Casualty Company, 521 So.2d 854 (Miss. 1987), (allowed a Class II insured to stack both vehicles which were covered by a single personal policy issued to the owner of the vehicle which she was driving with permission at the time of the accident). See also Curry v. Travelers Indemnity Co., 728 F. Supp. 1299 (S.D.Miss. 1989), (Injured taxi driver, a Class II insured, was allowed to stack uninsured motorist benefits pursuant to his employer's single business policy).
This Court has observed that the Uninsured Motorist Act must be "construed liberally to provide coverage and strictly to avoid or preclude exceptions or exemptions from coverage." Mississippi Farm Bureau Mut. Ins. Co. v. Garrett, 487 So.2d 1320, 1323 (Miss. 1986). To jurisprudentially designate Steel's policy a "large, commercial fleet policy" for the purpose of *655 aligning our views on stacking with those jurisdictions which have precluded stacking under these type policies, would create, rather than preclude, an "exception from coverage." Such a construction is foreign to our UM statute. As we recognized in Wickline, we are bound by our statute, not the jurisprudence of foreign jurisdictions.

Legislative Deference
Considering the applicable rules of stacking, as well as our determination that stacking is a "positive gloss" of our UM statute, we must hold that the trial court was correct in allowing the stacking of coverage in this case. In so holding, we recognize that our statutory scheme does not distinguish a "commercial fleet policy" from any other type of auto insurance policy nor is it defined therein. Furthermore, this Court has not discovered a single jurisprudential definition of "commercial fleet policy." Of primary importance is the fact that a proposal which would prohibit the stacking of insurance policies was recently rejected through our legislative process.
Out of deference to the authority of our legislature, we can not modify the Uninsured Motorists Coverage Act by imposing a jurisprudential definition upon the scheme. Unlike other jurisdictions, such as Alabama, Minnesota and Montana[2], which have legislatively mandated that stacking is contrary to public policy, stacking is retained in Mississippi as a "positive gloss" of our UM statute.
In Mississippi, we have no statutory basis for distinguishing a commercial fleet policy. The legislature has not seen fit to overrule our stacking decisions nor do we choose to do so today. We hold that the lower court decision to allow stacking was correct.

IV.

DID THE TRIAL COURT ERR IN ALLOWING LARRY'S BENEFICIARY TO STACK THE TRAILERS INSURED BY THE FLEET POLICY?
Alternatively, should Larry's beneficiary be allowed to stack the uninsured benefits under the fleet policy, Travelers argues that only the vehicles and not the trailers listed in the policy be stacked.
Miss. Code Ann., § 83-11-103(b) (Supp. 1990), specifically refers to use of a "motor vehicle." This indicates that stacking is necessarily limited to those "motor vehicles" listed in the schedule of covered vehicles. This would be a factual determination for the trial court. As the record is not sufficiently documented to make this determination, we remand this issue to the lower court for a determination.

V.

IS TRAVELERS, AS THE WORKERS' COMPENSATION CARRIER, ENTITLED TO A CREDIT FOR THE WORKERS' COMPENSATION BENEFITS IT HAS PAID ON BEHALF OF THE DECEASED?
In Cossitt v. Nationwide Mut. Ins. Co., 551 So.2d 879, 885-887 (Miss. 1989), we aligned ourselves with those jurisdictions which bar a workers' compensation carrier from recovering from the employer's uninsured motorist carrier. In that case, we strictly construed the language of Miss. Code Ann. § 71-3-71 (1972), which reads, in part:
An employer or compensation insurer who shall have paid compensation benefits under this chapter for the injury or death of the employee shall have the right to maintain an action at law against any other party responsible for such injury or death... . If recovery shall be had against such other party, by suit or otherwise, the compensation beneficiary shall be entitled to any amount recovered over and above that amount that the employer and insurer shall have paid. (Emphasis added).
The record before us indicates that Larry's beneficiary failed to recover anything *656 from the party responsible for Larry's death. Therefore, in concert with this statutory mandate and recent jurisprudence, Travelers, as workers' compensation carrier, is not entitled to recover.

VI.

WAS THE DECEDENT A NAMED INSURED FOR THE PURPOSES OF UNINSURED MOTORIST COVERAGE?
Linda, as cross-appellant, argues that Larry was a "named insured" and therefore, a Class I insured for the purposes of uninsured motorist coverage. Section 83-11-103(b) defines an insured as follows:
The term "insured" shall mean the named insured and, while resident of the same household, the spouse of any such named insured and relatives of either, while in a motor vehicle or otherwise, and any person who uses, with the consent, expressed or implied, of the named insured, the motor vehicle to which the policy applies.
In Stevens, 345 So.2d at 1043, we recognized that this statute creates two distinct classes of insureds. The first class consists of the named insured, and while residents of the same household, his spouse and relatives of either. The coverage to this class of insureds extends to those situations "while in a motor vehicle or otherwise."
The second class of insureds consists of "any person who uses, with the consent, expressed or implied, of the named insured, the motor vehicle to which the policy applies." The record clearly indicates that Larry was in this latter class and this assignment is without merit.

VII.

DID THE TRIAL COURT ERR IN IMPOSING THE STATUTORY MINIMUM OF $10,000 UNINSURED MOTORIST COVERAGE PER VEHICLE INSTEAD OF $25,000 UNINSURED MOTORIST COVERAGE PER VEHICLE?
Linda's second assignment of error on cross-appeal poses the following question: Where uninsured motorist coverage results by operation of law, should the imposed coverage be the statutory minimum or should it be the amount contracted in a previously cancelled policy?
The trial court, in its January 24, 1988, order, answered as follows:
This matter is before the court on defendant's motion for judgment notwithstanding the verdict or alternative for new trial. The only issue remaining for decision is whether the amount of uninsured motorist coverage provided by Travelers is $10,000 or $25,000.
The insurance contract in question was written through the Assigned Risk Pool. The application purported to reject uninsured motorist coverage, but it was later disclosed that the insured had not authorized a rejection. It also appears that, purely as a matter of coincidence, the insurance company drawing the risk, Travelers, was the same company which previously carried the insured and which had rejected further coverage. In its previous policy the insured had uninsured motorist coverage at $25,000. The statutory minimum which applies as a matter of law where coverage is not rejected is $10,000. Plaintiff argues that the $25,000 coverage should apply because the insurer's "agent" rejected coverage in the face of a prior policy providing for this amount. Travelers argues that because it was in an assigned risk pool the acts of the broker cannot be attributed to it; that the unauthorized rejection was simply ineffective and that therefore the minimum coverage is in effect.
The question is whether the plaintiff's employer effectively contracted for coverage greater than the statutory minimum. The record is silent. There is no evidence of any application except that signed by the broker which purported to reject all coverage. The parties agree that this rejection is ineffective. Plaintiff seeks a contract by implication at a former level but there is simply no evidence *657 that either party intended such a contract.
Accordingly, this court concludes that the level of uninsured motorist coverage available is in the amount of $10,000 for each covered vehicled [sic].
In reviewing a JNOV, we are required to review the evidence in a light most favorable to the appellant, disregarding any evidence of the appellee in conflict with the evidence favorable to the appellant. Waller v. Dixieland Food Stores, Inc., 492 So.2d 283 (Miss. 1986). The record reveals no evidence which indicates that either party intended to reinstate the policy limits which were contained in Steel's former policy with Travelers.
The stipulation of facts reveals that the uninsured motorist benefits were written into the assigned risk policy through operation of law. There is absolutely no evidence to indicate that Steel and Travelers intended to impute the uninsured motorist limits from the cancelled policy into the assigned risk policy. Because coverage was written into the contract by operation of law, so was the amount of coverage. As no evidence supports Linda's position, we must affirm the trial judge's determination that the policy limits were $10,000 per vehicle.

VIII.

WHAT CONSTITUTES PRIMARY VERSUS EXCESS UNINSURED MOTORIST COVERAGE?
Shelter requests this Court to resolve the issue of "primary" over "excess" insurance in uninsured insurance benefits. They contend that if the damages suffered do not justify payment of all available uninsured motorist coverage, each uninsured motorist carrier should pay a pro rata share of the damages suffered by the insured with these pro rata shares to be determined by the comparison of each carrier's separate coverage to the total available coverage.
The jury determined that total damages amounted to $549,000.00. However, the record reveals that the total insurance coverage available through Travelers amounted to only $210,000.00. Therefore, whether Shelter, as the decedent's personal uninsured motorist carrier, is termed excess or primary is purely academic. Shelter is liable for $50,000.00.
Because this case presents a situation where the available funds were insufficient to satisfy the total losses suffered, Shelter's request is not ripe for resolution. As the determination of whether this personal coverage is labeled as primary or excess is inconsequential to the final outcome, we decline to address this matter at this time and reserve the resolution of this problem for another day.
In reviewing the uninsured motorist statute, and considering our previous stacking decisions, we affirm the trial court's determination to allow the stacking of the motor vehicles insured under Steel's policy. This cause is remanded for a determination of which insured vehicles qualify as "motor vehicles" for the purpose of uninsured motorist coverage.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, ANDERSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., concurs in parts I, II, IV, V, VI, VII and VIII and dissents to part III.
NOTES
[1] In Cossitt at page 884 we said:

It is a matter of common knowledge that many individuals have from three to seven vehicles, or more, on one policy for family use. The policy is not considered to be a fleet policy. As in Yeager v. Auto-Owners Insurance Company, 335 N.W.2d 733 (Minn. 1983), we are not faced with a large, commercial fleet policy. (Emphasis added).
In this opinion, we might have added that we refused to classify the church's business policy as a fleet policy because the legislature does not force us to make such a distinction. Suffice to say, the power to create such a classification of insurance policies is within the ambit of the legislative process. The statutory language employed in our Uninsured Motorist Coverage Act does not require this Court to make such a distinction.
[2] See Ala. Code Ann. § 32-7-23(c) (1989); Minn. Stat. Ann. § 65B.49 Subd. 3a(5), (6) (1990 Supp.); Mont. Code Ann. § 33-23-203(1) (1989).