GRIFFIS, J.,
Dissenting:
¶29. I respectfully disagree with the majority’s resolution of the second assignment of error. Therefore, I dissent.
¶ 30. Proper consideration requires that we look at two separate issues. First, we must consider whether the accident arose out- of the “use” of an uninsured vehicle. Second, if the accident arose out of the use of an uninsured vehicle, we must then consider the question of causation, i.e., whether the Ryalses’ deaths were caused by an accident which arose from the use of an uninsured vehicle. After review of either or both of these issues, I am of the opinion that this Court is obligated to reverse and render.

A. Did the accident arise out of the “use” of the Mississippi Department of Transportation vehicle?

¶ 31. I agree with the majority’s statement of the law in paragraph 15. However, it is with the application of this legal principle where the majority and I differ.
¶ 32. For my analysis, I use the uninsured, motorist coverage provision of the Alfa policy that the majority found to be in effect. According to the majority, this provision read:
We will pay damages for bodily injury to a covered person if the covered person is legally entitled to collect such damages from the owner or driver of an uninsured car. The bodily injury must *685 be caused by accident arising out of the operation, maintenance or use of an uninsured car.
(emphasis in original). The majority correctly limits our consideration to determine whether the accident arose out of the “use” of the Mississippi Department of Transportation vehicle. The Ryals family did not claim that the accident arose out of either the operation or maintenance of the vehicle.
¶ 33. The policy defined several terms. “Use” was defined to mean “the actual manual and physical driving of a car.” “Car” was defined to mean “a land motor vehicle with four or more wheels, which is designed for use mainly on public roads.” (emphasis in original).
¶ 34. The facts of this case are not the typical facts we consider in uninsured motorist cases. Indeed, this is a case of first impression in Mississippi.
¶ 35. There was no collision or impact between the Ryalses’ vehicle and the MDOT vehicle. Instead, the Ryalses contend that MDOT’s efforts in removing a dead pine tree from the roadside by the use of its hydraulic lift platform (also commonly referred to as a “bucket”), which was permanently attached to the vehicle, constitute the “use” of an uninsured vehicle. The “use” of the MDOT vehicle occurred several months before the Ryalses were tragically killed.
¶ 36. Charles Finnegan testified that, about four to six months before the Ryals-es’ accident, he observed a MDOT platform truck attempting to push down the dead pine tree that fell on the Ryalses’ vehicle. Finnegan described what he saw. He testified that the MDOT vehicle had a hydraulic lift platform attached to it and the MDOT personnel were maneuvering the platform to push against the tree in an effort to push down the dead tree. Finnegan testified that he saw MDOT personnel bump the tree several times but they were not successful with their attempts, and the tree remained standing. Finnegan also testified that the truck was stationary and only the platform was moving. He did not see any MDOT personnel in the cab of the truck.
¶ 37. In 1998, Charles Walters was the roadside development supervisor for MDOT. He testified that. the platform could be operated from two places. The operator could maneuver the platform by operating the controls on the platform itself, or the operator could maneuver the platform from the controls located on the side of the vehicle. There were no controls in the cab of the truck.
¶ 38. Oscar Brown, a former MDOT employee, testified that he had previously operated the platform truck in an effort to push over dead trees. He could not testify that he placed the platform on the tree that fell on the Ryalses’ vehicle. Brown, however, did testify that when he operated the platform in an effort to push down a tree that he used the levers on the side of the vehicle to maneuver the platform.
¶ 39. There was no evidence to suggest that the MDOT vehicle was in transit or was involved in any mode of transportation. There was no evidence that an MDOT employee was behind the steering wheel or that the vehicle’s engine was running. There was no evidence that an MDOT employee was driving or using the vehicle for any purpose related or incident to transportation. Instead, the vehicle was stationary. The vehicle’s purpose, at the time in question, was to allow the MDOT employees to maneuver the equipment permanently attached, i.e., the lift platform, for purposes that bore no relation to transportation services.
¶ 40. There are several Mississippi cases that have expanded the definition of *686 “use” to include activities that are incident to the transportation function of the vehicle. In Stevens v. U.S. Fidelity & Guaranty Co., 345 So.2d 1041, 1043 (Miss.1977), the court held that “[wjhether or not an injury arises from the use of a vehicle within the meaning of the statute depends upon the facts of each case.” Stevens was a wrecker operator. His duties required that he respond to calls by driving to the scene of an accident to remove a disabled vehicle. Id. at 1042. Stevens responded to a call to pick up a truck that had been involved in an accident. He attached the damaged truck to his wrecker and removed it from the highway. Stevens then got out of his wrecker to sweep the accident debris off the highway. He left his wrecker motor running and all emergency lights on. Id. After he finished removing the debris, Stevens started walking back to his wrecker when he was hit by an uninsured motorist. He was approximately six to eight feet from his wrecker when he was hit. Id. The supreme court held that Stevens had not abandoned the use of his wrecker and his injuries were incurred from the use of his wrecker. Id. at 1044.
¶ 41. In Harris v. Magee, 573 So.2d 646 (Miss.1990), a construction company employee was driving a self-propelled crane to a job site when the crane encountered mechanical difficulties. Magee, also employed by the construction company, was following the crane, stopped and crawled under the crane to try to repair it. Id. at 648. As Magee crawled from under the crane, he was hit and killed by an uninsured motorist. Magee’s wrongful death beneficiaries brought suit to recover uninsured motorist benefits from the construction company’s insurance carrier. The supreme court held that coverage was available and found that Magee was performing duties directly related to the use of the insured vehicle when struck by the uninsured motorist. Id. at 651.
¶ 42. In both Stevens and Harris, the person injured had only recently exited a vehicle that was still accessible. Neither of these cases are on point with the instant case. Here, we consider whether the operation of equipment permanently attached to an uninsured vehicle can constitute the “use” of that vehicle. I find no Mississippi precedent on this issue.
¶ 43. In Progressive Cas. Ins. Co. v. Yodice, 180 Misc.2d 863, 866-67, 694 N.Y.S.2d 281, 283-84 (N.Y.Sup.Ct.1999), the court held:
Not every accident involving an automobile concerns the use or operation of that vehicle. The accident must be connected with the use of the automobile qua automobile. The use of the automobile as an automobile must be the proximate cause of the injury, [citations omitted]. The inherent nature of an automobile is to serve as a means of transportation to and from a certain location, [citation omitted]. The accident in question did not arise out of the use or operation of the truck as a truck, i.e., as a means of transportation; it arose out of the operation of a business operating a ride, which happened to be permanently secured to the back of a stationary vehicle.
¶ 44. In D & M Logging Co. v. Huffman, 189 W.Va. 9, 427 S.E.2d 244, 247 (1993), the court held that the “[u]se of the crane is not ‘operation, maintenance or use of a covered auto ’ because the definition of an ‘auto’ specifically excludes coverage of the crane.” The court determined that the only relationship to the automobile insurance policy was the allegation that one of D & M’s employees negligently loaded logs onto a truck. The court concluded that the language of the insurance policy, considered with the statutorily required policy language, did not extend coverage to the *687 circumstance where the claim is based on the insured’s employee negligent loading of logs by use of a mechanical device attached to the covered vehicle. Id.
¶45. The majority has expanded the definition of “use” beyond the Alfa policy or the Mississippi uninsured motorist statutes. The Alfa policy defined “use” as the “actual manual and physical driving of a car.” It is clear from this definition that “use” required someone to be driving the vehicle for some type of transit or transportation purpose. I am of the opinion that the trial court erred,, as a matter of law, in its determination that there was sufficient evidence for the jury to conclude that the accident arose from the use of the MDOT vehicle. I would reverse and render on this issue.

B. Whether the Ryalses’ deaths were caused by an accident that arose from the use of an uninsured vehicle?

¶ 46. Even if we accept that the accident arose out of the use of an uninsured vehicle, we must then consider the question of causation, i.e., whether the Ryalses’ deaths were caused by an accident which arose from the use of an uninsured vehicle.
¶ 47. The seminal case on this issue is Merchants Company v. Hartford Accident & Indemnity Company, 187 Miss. 301, 188 So. 571 (1939). A Merchants Company delivery truck ran off a road into a ditch. The Merchants Company’s agents or employees used several large poles to remove the truck from the ditch and left without removing the poles. Later that evening, an individual was injured when his vehicle collided with the poles that had been left. The issue before the court was whether the accident arose out of the operation, maintenance or use of an automobile. Id. at 572. The court held:
Our conclusion, under a policy such as is here before us, is that where a dangerous situation causing injury is one which arose out of or had its source in, the use or operation of the automobile, the chain of responsibility must be deemed to possess the requisite articulation with the use or operation until broken by the intervention of some event which has no direct or substantial relation to the use or operation, — which is to say, that the ■event which breaks the chain, and which, therefore, would exclude liability under the automobile policy, must be an event which bears no direct or substantial relation to the use or operation; and until an event of the latter nature transpires the liability under the policy exists.
Certainly the use of the poles to extricate the truck from the roadside ditch was an event which arose out of, transpired in, ■ and was necessary to, the operation of the truck. The use of the poles in extricating the truck was a part and parcel of the operation of the truck. The next event which happened was that the truck drove away, leaving the poles in the road, but the poles were not left until the moment when the truck drove away. There was no intervention of something which had no direct or substantial relation to the use or operation. The use of the poles in extricating the truck and thence the driving away and leaving the poles in the road thus had such a direct and substantial relation or connection in point of actual fact as respects the use and operation of the truck that in order to separate that use or break its continuity, we must interpose or insert, not an independent act, there being none such, but the negligent omission to remove the poles from the road, which, if allowed, would be to insert or interpolate into the contract a provision that liability shall follow only as to a strictly proximate cause; and, under fa *688 miliar rules, we cannot rewrite the insurance contract by interpolating that provision therein.
Id at 572. Thus, the court held that the failure to remove the poles was not an intervening cause, so there was coverage under the automobile policy. Id. at 572.
¶ 48. The supreme court considered this issue again in Jackson v. Daley, 739 So.2d 1031 (Miss.1999). In Jackson, an individual was killed in an accident on a one lane gravel road maintained by Jefferson Davis County. Id at 1034(¶ 4). Earlier that day, a county road crew unloaded three piles of dirt on the shoulder of the road. Id at (¶ 5). The claimants asserted that Jackson’s fatal accident was caused by Jackson either colliding with one of the piles or in an effort to avoid the piles of dirt. Id The court considered whether the county’s automobile insurance covered the accident. Id at 1040-41 (¶ 37). The court stated the controlling legal principle as follows:
When a policy insures an automobile for the “use” of the automobile, the chain of causation between the use of the automobile and the injury must be direct. National Mut. Cas. Co. v. Clark, 193 Miss. 27, 7 So.2d 800, 803 (1942). We will not extend coverage if the use of the automobile is within the line of causation, . but is distinctly remote. Merchants Co. v. Hartford Accident & Indem. Co., 187 Miss. 301, 188 So. 571 (1939).
Jackson, 739 So.2d at 1041 (¶ 40). The supreme court held that leaving the dirt near the side of the road was “not so remote as to bear no direct or substantial relation to the use or operation of the dump truck in this case. There was no intervening cause here to break the chain of responsibility.” Id at 1042 (¶ 42).
¶ 49. There was no evidence of any direct contact between the MDOT vehicle and the Ryalses’ vehicle. There was no evidence that the MDOT vehicle was used to push against the tree at the time that the tree fell.
¶ 50. The tree in question had been dead for some time both before the MDOT vehicle used its platform to apply force or pressure or before the tree fell. Neither of the expert witnesses testified that the tree fell as a direct result of the force or pressure applied by the equipment attached to the MDOT vehicle. Instead, they both agreed that trees begin to rot and decay as soon as they die. After the tree fell, all inspections indicated that the tree was infested by insects as well as in an advanced state of rot and decay. Nevertheless, the tree remained standing for several months after the platform of the MDOT vehicle applied force or pressure to try to push it down.
¶ 51. The evidence in dispute was from the expert testimony. The Ryalses presented a forestry expert who testified that the force or pressure applied allowed further insect infestation, rot or decay, which weakened the condition of the dead tree. Alfa’s forestry expert testified to the opposite conclusion. Both experts testified that the rain and wet conditions also contributed to the timing of the tree’s fall.
,¶ 52. While the use of the MDOT vehicle’s equipment may have been within the line of causation, any such use was distinctly remote in both time and actual force or pressure applied. Accordingly, under Merchants Company and Jackson, we should not extend coverage where the use of the automobile was within the line of causation, but was distinctly remote. Accordingly, I would reverse and render.
BRIDGES AND SOUTHWICK, P.JJ., JOIN THIS SEPARATE OPINION.