608 So.2d 1258 (1992)
In re Judy Hanna KOESTLER, Personal Representative of William D. Koestler, Deceased, FOR the BENEFIT OF Judy Hanna Koestler, Stephanie Dawn Koestler, Scott Downing Koestler, and Christopher Kyle Koestler, Wrongful Death Beneficiaries, and Judy Hanna Koestler, Executrix of the Last Will and Testament of William D. Koestler.
CASUALTY RECIPROCAL EXCHANGE
v.
Federal Insurance Company.
No. 89-CA-0140.
Supreme Court of Mississippi.
August 31, 1992.
Rehearing Denied December 3, 1992.
*1259 Philip Mansour, Sr., Mansour & Mansour, Greenville, for appellant.
Stephen L. Thomas, Andrew N. Alexander, III, Lake Tindall, Hunger & Thackston, Greenville, for appellee.
Richard T. Phillips, Smith Phillips & Mitchell, Batesville, for amicus curiae.
EN BANC.
ROBERTSON, Justice, for the Court:

I.
This appeal in which insured seeks to stack uninsured motorist ("UM") liability insurance coverages presents a new twist. Today's insured had two policies providing in the aggregate five UM coverages, each with limits of liability well in excess of the statutory minimum. The question is whether our positive law of stacking permits enforcement of a clearly worded policy provision that denies stacking of coverages in excess of the statutory minimum.
The Circuit Court answered in the affirmative. Because our law respects freedom of contract, over and above its positively commanded mandatory minimums, we reverse.

II.

A.
On May 25, 1986, Anthony Raiford (sometimes "UM Raiford"), a totally uninsured motorist, was driving in an easterly direction on the Arcola-Wayside Road in Washington County, Mississippi. Raiford crossed the center line and struck head on a 1984 Chrysler Fifth Avenue driven by William D. Koestler, age 53. As a direct and proximate result of Raiford's negligence, Koestler received severe and ultimately fatal personal injuries.
Koestler left surviving him a widow, Judy Hanna Koestler, and three children, an emancipated daughter, Stephanie Dawn Koestler, and two minor sons, Scott Downing Koestler and Christopher Kyle Koestler.
Prior to May 25, 1986, William D. Koestler had purchased from Casualty Reciprocal Exchange ("CRE"), a non-resident insurance company authorized to do business in Mississippi, two "Personal Auto Policies," including coverages for bodily injuries to and wrongful death of himself where caused by an uninsured motorist. Koestler owned five automobiles. Three were insured in one of the policies, the other two in the other, each in the amount of $250,000.00 per person injured or killed. Each provided in the event of multiple coverages CRE's liability "shall not exceed the highest applicable limit of liability under any one policy," i.e., $250,000.00. Koestler had paid a separate premium for each of these five coverages. Without dispute, each coverage was in full force and effect on the date of Koestler's death, and, independent of each other, each afforded coverage for wrongful death damages caused by UM Raiford, subject to its legally enforceable limits of liability.
Koestler had as well, prior to May 25, 1986, purchased from Federal Insurance Company ("Federal"), another foreign insurance company authorized to do business in Mississippi, a "Personal Excess Liability" policy providing excess coverage of $1,000,000.00 bodily injury or wrongful death caused by an uninsured motorist. Under the terms of this excess policy, Federal agreed to pay all damages sustained as a result of the negligent act of an uninsured motorist, over and above and in addition to the amounts Koestler recovered under any other applicable UM coverages, up to $1,000,000.00.

*1260 B.
On August 14, 1987, Judy Hanna Koestler, acting as the personal representative of William D. Koestler, deceased, pursuant to Miss. Code Ann. § 11-7-13 (1972) (as amended), filed her complaint in the Circuit Court of Washington County, Mississippi, naming CRE and Federal as Defendants. Executrix Koestler charged, first, that under the law of this state the five UM coverages CRE had provided her deceased husband should be stacked, affording a potential coverage of $1,250,000.00. She then claimed that this did not begin to cover all wrongful death damages caused by UM Raiford, by reason of which she demanded in addition the $1,000,000.00 of coverage Federal had afforded in its excess UM policy.
Throughout the pre-trial process, Executrix Koestler insisted that her wrongful death damages exceeded $2,250,000.00. CRE and Federal conceded the fact of damages, but in a far more modest sum. In pre-trial discovery, Executrix Koestler disclosed her intention to call as an expert witness an economist who would offer an opinion that the net cash value alone of Koestler's life on the date of his death was $2,016,899.00. CRE at all times insisted that the limit of its aggregate liability was $250,000.00, citing the unambiguous provision in each policy that, in the event of multiple UM coverages or multiple UM policies, CRE's aggregate liability would "not exceed" $250,000.00, the limit for each separate coverage.
On September 12, 1988, Executrix Koestler's case against CRE and Federal went to trial. During a recess, the parties entered into settlement negotiations and soon announced to the Court in chambers a settlement of the wrongful death claim, the essence of which was that the two defendant UM insurers would pay to Executrix Koestler $1,100,000.00, and thus limit their exposure, reserving the right to litigate among themselves their respective ultimate liabilities for this settlement sum, all of which would turn on the stacking issue. Specifically, the Circuit Court reported the settlement terms included:
(1) Each of the Defendants would pay $550,000 to the Koestlers;
(2) A judgment would be entered in favor of the Koestlers in the amount of $1,100,000 against the Defendants, and the Defendants would file cross-claims against each other for the purpose of .. . [litigating] the limit of liability issue... .
In due course, CRE and Federal filed their cross-claims against each other. CRE claimed  as it had throughout  it owed only the first $250,000.00, the limits of coverage on one UM policy, in consequence of which Federal was responsible for all settlement sums over and above $250,000.00, some $850,000.00, to be exact. CRE thus demanded that Federal cough up $300,000.00, over and above the $550,000.00 Federal had paid to Executrix Koestler.
Conversely, Federal took the position Executrix Koestler had been taking all along, that is, that the five CRE UM coverages could and should be stacked, in consequence of which CRE afforded coverage for $1,250,000.00, and since that sum exceeded the settlement amount of $1,100,000.00, CRE should reimburse Federal for the entire $550,000.00 Federal had contributed to the settlement.
The Circuit Court, on January 18, 1989, entered a judgment resolving all issues in favor of Federal and against CRE. In summary, the Circuit Court stated:
... [T]he fact that CRE has a limitation provision in its policy which may be said to be clear and unambiguous is entirely irrelevant. What does matter, and it is the only thing that matters, is that Koestler was charged and paid separate premiums for each endorsement of uninsured motorist coverage in the amount of $250,000 for five vehicles covered by the two policies. Pursuant to the terms of the uninsured motorist statute, CRE is obligated to pay Koestler's heirs all sums which they were entitled to recover from the uninsured motorist as damages for the death of Koestler, whatever that amount might be up to the coverage paid for, $1,250,000.00.
The Court then entered judgment on Federal's cross-claim in the amount of $550,000.00 *1261 against CRE and dismissed CRE's cross-claim against Federal with prejudice.
CRE now appeals to this Court.

III.
Negligently driving uninsured motorists are a plague upon society. They inflict severe losses and at random, losses not in the least less severe that they are less noticed  by the media and legislators  than drunk driving death and damage. Different states have responded to the uninsured motorist menace in different ways. This state's initial response was enactment of the Uninsured Motorist Act of 1966. See Miss. Laws, ch. 524 (1966), originally codified as Miss. Code Ann. § 8285-51, et seq. (1942). That act has been amended and is presently codified as Miss. Code Ann. § 83-11-101, et seq. (1972). The statute's modest remedy has been demonstrably imperfect from the beginning, its required coverage being but the minimum amount required under the Mississippi Motor Vehicle Safety Responsibility Act, so that at the time Koestler bought his coverages, the UM act required only that:
No automobile liability insurance policy or contract shall be issued or delivered ..., unless it contains an endorsement or provision undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law... .
Those minimum limits at the time were $10,000.00 for damages or losses to any one person and an aggregate of $20,000.00 for all damages or losses caused in a single accident. Miss. Code Ann. § 63-15-11 (1987).
It has for years been a fact of life that many of our citizens and families own more than one automobile, and so we quickly began to find that persons injured by uninsured motorists held multiple minimum UM coverages, each of which by its terms afforded protection for the injuries inflicted by the uninsured motorist. See Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879, 884 (Miss. 1989). In the wake of the woeful inadequacy of the statutory minimum coverage, the question gradually arose whether the insured could recover on each of the insurance contracts he held  somewhat as in the case of life insurance or health and accident insurance where an insured or beneficiary often recovers under multiple policies  or whether the insured was limited to a single coverage.
Southern Farm Bureau Casualty Insurance Co. v. Roberts, 323 So.2d 536 (Miss. 1975), first found contract and statute to allow an insured to aggregate coverages under three separate policies. Hartford Accident & Indemnity Co. v. Bridges, 350 So.2d 1379 (Miss. 1977), involved a single policy insuring three vehicles upon which three separate coverages were afforded. We again read the act into the policy and allowed stacking. Matters have proceeded apace, and our cases have accepted an ever expanding role for stacking. See, e.g., Thiac v. State Farm Automobile Insurance Co., 569 So.2d 1217 (Miss. 1990); Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879 (Miss. 1989); Brown v. Maryland Casualty Co., 521 So.2d 854 (Miss. 1987); State Farm Mutual Automobile Insurance Co. v. Kuehling, 475 So.2d 1159 (Miss. 1985), and Government Employees Insurance Co. v. Brown, 446 So.2d 1002 (Miss. 1984). The theory of these cases without exception has been that insurer and insured have entered two or more contracts covering the same eventuality and that the insured may enforce these contracts according to their terms. To be sure, these contracts may have been encouraged by statute, and at times we have found ambiguities and resolved them in the insureds' favor. This does not alter the fact that the legal origin of stacking is contract and not statute. In addition, these cases all concerned the stacking of mandatory minimum UM coverages, a point of importance as will presently appear.
Insurers have responded to our cases (and, no doubt, those of other jurisdictions) by increasingly clear and explicit policy language which precludes stacking. No one *1262 today seriously argues the CRE policy language is ambiguous. The Circuit Court found the coverage limitation "to be clear and unambiguous" and then found this to be "entirely irrelevant." The unspoken premise of the decision below is the common law principle that contracts contrary to public policy are unenforceable, no matter how clear or unambiguous they may be. See, e.g., Hertz Commercial Leasing Division v. Morrison, 567 So.2d 832, 834-35 (Miss. 1990), and cases there cited.
Today's issue  whether UM coverages in excess of mandatory minimums may be stacked  is implicit in Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879 (Miss. 1989). Cossitt arose out of an accident occurring on April 10, 1984, covered by a liability insurance policy which provided uninsured motorist coverage in the amount of $25,000.00 on each of three separate vehicles, upon which the insured had paid three separate uninsured motorist premiums. At the time, the statutorily required minimum limits of liability required to be included in uninsured motorist coverages in all policies was $10,000.00 per person and $20,000.00 per occurrence. At least a portion of the UM coverage Nationwide had written in the Cossitt case was in excess of that statutorily required. Cossitt, 551 So.2d at 883-84, held three $25,000.00 coverages should be stacked but concentrated on other "stacking" issues and did not address or decide the point now before us. Expansive though our readings have been, we have stopped short of deciding, in the absence of contract to the contrary, that uninsured motorist coverages in excess of the minimum mandated by statute may be stacked to the extent of the excess.

B.
In the wake of our caselaw, CRE concedes  as it must  that it has a minimum liability on each of the five coverages of $10,000.00, or a stacked aggregate of $50,000.00, and it concedes that this point has been settled at least since Lowery v. State Farm Automobile Insurance Co., 285 So.2d 767 (Miss. 1973). CRE concedes as well that it has by contract obligated itself in excess of this minimum obligation, in that it has written UM coverage with a $250,000.00 limit of liability. These concessions made, CRE insists the rule is, its liability after stacking is the mandatory minimum provided by law, multiplied by the number of coverages in force, or the limit of liability provided by contract, whichever is the greater. By appealing the Circuit Court's judgment, CRE presents the question whether it must stack in its insured's favor the five UM coverages in excess of the minimum statutory requirement for each vehicle, and in excess of the contractual limit of liability for one such coverage. CRE presents this question against the backdrop of unmistakable language in each of the two policies, applicable to each of the five coverages Koestler held, that its liability be limited to the maximum limit of liability under any one coverage, i.e., $250,000.00.[1] There is simply nothing unclear about these words.
*1263 Insurance policies are privately made law. Except as limited by the public law, we respect the right of insurer and insured to contract freely one with the other. See, e.g., Perry v. Southern Farm Bureau Casualty Insurance Company, 251 Miss. 544, 550, 170 So.2d 628, 630 (1965). This is another powerful public policy our law accommodates with that regarding the UM menace. Our Uninsured Motorist Act does indeed inhibit freedom of contract, but not beyond its terms. We held early that insurer and insured as
free to contract as to uninsured motorist coverage in any respect so long as the required coverage is not cut down by the policy provisions.
State Farm Mutual Automobile Insurance Co. v. Talley, 329 So.2d 52, 54 (Miss. 1976) (quoting Talbot v. State Farm Mutual Automobile Insurance Co., 291 So.2d 699, 701 (Miss. 1974)). We have repeatedly held
[a]ny attempt to contractually limit an insurer's duty of coverage ... may not be effective to narrow the requirements of ... [the] statute,
State Farm Mutual Automobile Insurance Co. v. Nester, 459 So.2d 787, 789 (Miss. 1984). But the act "allows insurers to contract [as they please] with regard to excess coverage." Wickline v. United States Fidelity & Guaranty Co., 530 So.2d 708, 717 (Miss. 1988) (quoting State Farm Mutual Automobile Insurance Company v. Kuehling, 475 So.2d 1159, 1162 (Miss. 1985)). Put another way, there is no public policy against limiting insurance coverages. Over and above legally mandated minimums, the parties have always remained free to agree as they wish. The Act but reinforces the point when it empowers the parties to contract for coverage "over the minimum requirement."[2]
And so CRE is on target when it calls our attention to our several cases holding that medical payment coverages in uninsured motorist insurance policies are not subject to stacking. See, e.g., State Farm Mutual Automobile Insurance Co. v. Acosta, 479 So.2d 1089 (Miss. 1985); State Farm Mutual Automobile Insurance Co. v. Scitzs, 394 So.2d 1371, 1372-73 (Miss. 1981); see also, Tucker v. Aetna Casualty & Surety Co., 609 F. Supp. 1574, 1580 (S.D.Miss. 1985). The point is that medical payment coverages are not statutorily required, and we have in that area allowed private lawmaking to prevail; that is, unambiguously worded policy provisions may limit medical payment coverages to a single coverage, notwithstanding that there are multiple coverages and that the insured has paid a separate premium for each UM medical payment coverage. These cases are consistent with the view that only statutorily required UM liability coverages are subject to stacking.
It is no answer that CRE charged and Koestler paid a separate premium for each of his five UM coverages. This but begs the question, what coverage was purchased by what premium?, and we find our answer in contract and not natural law. See Wickline, 530 So.2d at 714. The "coverage" Koestler purchased with each premium was the aggregate UM package of each policy. This includes the act implicitly incorporated into each coverage. It includes as well the limits of liability, per person and per occurrence, and, as well, the multiple policies limit. But a moment's reflection makes clear, actuarially, the premium charged for each coverage will be higher, if all five $250,000.00 coverages may be stacked, than if the multiple policy limitation clause is enforceable. What is important is that the policies clearly told Koestler what coverage his premiums purchased for him, and what limits of liability entailed that coverage. No one argues Koestler did not read *1264 his policies or was not aware of their contents, nor could they with legal effect.
To be sure, our stacking cases routinely take note of the payment of separate premiums. See, e.g., Harris v. Magee, 573 So.2d 646, 652 (Miss. 1990); Cossitt, 551 So.2d at 884; Brown v. Maryland Casualty Co., 521 So.2d 854, 856 (Miss. 1987); Government Employees Ins. Co. v. Brown, 446 So.2d 1002, 1005-06 (Miss. 1984); Southern Farm Bureau Casualty Ins. Co. v. Roberts, 323 So.2d 536, 538 (Miss. 1975). This is but an equitable note undergirding the fairness of the stacking mandated and enforceable by reason of contract. E.g., Pearthree v. Hartford Accident & Indemnity Co., 373 So.2d 267, 270 (Miss. 1979) ("a construction permitting ... [stacking] flows from the ambiguity of the limiting clauses ..., not from the charging of separate premiums"). No particular premium purchases any particular UM coverage beyond the limits of liability language in the policy.
What we have before us is limits-of-liability language no one could fail to understand. That language told Koestler, in the event he was protected by multiple UM coverages
the maximum limit of our liability under all the policies shall not exceed the highest applicable limit of liability under any one policy.
Importing the act into each policy, the sum CRE concedes it must pay still well exceeds  by $200,000.00  the minimum limits mandated by Section 83-11-101 and the Mississippi Motor Vehicle Safety Responsibility Law. We have no authority to enlarge the insurance contract into one (we wish) the parties may have written.
The UM coverage under each Koestler-CRE policy was limited to $250,000.00 per person per accident. There were five separate vehicles insured in the two policies. The statute mandated that each vehicle have coverage of $10,000.00 per person. Under our positive law of stacking, CRE provided coverage of not less than $50,000.00 per person. As a practical matter, that law of contract enforcement requires that CRE pay at least $10,000.00 under each of the five coverages. How CRE allocates the remaining $200,000.00 of its liability among the two policies and their five coverages is beyond our concern today.
We see a two-fold remedy for those who covet Federal's (for the moment) view of the law. We have no doubt insureds like Koestler could pay a greater premium and purchase multiple UM coverages without the limitation clause, if not now, then soon. Money and the opportunity for profit can move the bureaucratically inert, even in the insurance industry. Beyond this, there is the public remedy across the street. If the Legislature disagrees with our action today, it may well amend the UM statute. It is within the legislative prerogative to provide, in the case of multiple UM coverages or policies, where the insured has paid and the insurer has received a separate premium, the insured may stack and thus recover on each such coverage or policy otherwise according to its terms, and that any language in any such coverage or policy to the contrary is a contract against public policy and is, thus, unenforceable. To date the Legislature has not so enacted, nor may we, consistent with our UM renderings heretofore.
The judgment of the Circuit Court is reversed. Judgment should be and is entered in favor of CRE and against Federal in the sum of $300,000.00, pursuant to the CRE-Federal settlement agreement.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER and PITTMAN, JJ., concur.
SULLIVAN, J., dissents with written opinion, joined by McRAE, J.
BANKS, J., dissents with written opinion, joined by DAN M. LEE, P.J., and SULLIVAN and McRAE, JJ.
McRAE, J., dissents with written opinion, joined by SULLIVAN and BANKS, JJ.
SULLIVAN, Justice, dissenting:
I have read both versions of the majority opinion in this case. As I believe the original version is the better reasoned opinion, I *1265 adopt it as my dissent and it is set out hereinbelow.[1]

I.
This appeal in which insured seeks to stack uninsured motorist ("UM") liability insurance coverages presents a new twist. Today's insured had two policies providing in the aggregate five UM coverages, each with limits of liability well in excess of the statutory minimum, and for which he had paid five separate premiums. The question is whether our positive law of stacking precludes enforcement of a clearly worded policy provision that denies stacking of coverages in excess of the statutory minimum.
The Circuit Court answered the question in the affirmative. I agree.

II.

A.
On May 25, 1986, Anthony Raiford (sometimes "UM Raiford"), a totally uninsured motorist, was driving in an easterly direction on the Arcola-Wayside Road in Washington County, Mississippi. Raiford crossed the center line and struck head on a 1984 Chrysler Fifth Avenue driven by William D. Koestler, age 53. As a direct and proximate result of Raiford's negligence, Koestler received severe and ultimately fatal personal injuries.
Koestler left surviving him a widow, Judy Hanna Koestler, and three children, an emancipated daughter, Stephanie Dawn Koestler, and two minor sons, Scott Downing Koestler and Christopher Kyle Koestler.
Prior to May 25, 1986, William D. Koestler had purchased from Casualty Reciprocal Exchange ("CRE"), a non-resident insurance company authorized to do business in Mississippi, two "Personal Auto Policies," including coverages for bodily injuries to and wrongful death of himself where caused by an uninsured motorist. Koestler owned five separate automobiles. Three were insured in one of the policies, the other two in the other, each in the amount of $250,000.00 per person injured or killed. Koestler had paid a separate premium for each of these five coverages. Without dispute, each coverage was in full force and effect on the date of Koestler's death, and, independent of each other, each afforded coverage for wrongful death damages caused by UM Raiford.
Koestler had as well, prior to May 25, 1986, purchased from Federal Insurance Company ("Federal"), another foreign insurance company authorized to do business in Mississippi, a "Personal Excess Liability" policy providing excess coverage of $1,000,000.00 bodily injury or wrongful death caused by an uninsured motorist. Under the terms of this excess policy, Federal agreed to pay all damages sustained as a result of the negligent act of an uninsured motorist, over and above and in addition to the amounts Koestler recovered under any other applicable UM coverages, up to $1,000,000.00.

B.
On August 14, 1987, Judy Hanna Koestler, acting as the personal representative of William D. Koestler, deceased, pursuant to Miss. Code Ann. § 11-7-13 (1972) (as amended), filed her complaint in the Circuit Court of Washington County, Mississippi, naming CRE and Federal as Defendants. Executrix Koestler charged, first, that under the law of this state the five UM coverages CRE had provided her deceased husband should be stacked, affording a potential coverage of $1,250,000.00. She then claimed that this did not begin to cover all wrongful death damages caused by UM Raiford, by reason of which she demanded in addition the $1,000,000.00 of coverage Federal had afforded in its excess UM policy.
Throughout the pre-trial process, Executrix Koestler insisted that her wrongful death damages exceeded $2,250,000.00. CRE and Federal conceded the fact of damages, but in a far more modest sum. In pre-trial discovery, Executrix Koestler disclosed her intention to call as an expert witness an economist who would offer an *1266 opinion that the net cash value alone of Koestler's life on the date of his death was $2,016,899.00. CRE at all times insisted that the limit of its aggregate liability was $250,000.00, citing an unambiguous provision in each policy that, in the event of multiple UM coverages or multiple UM policies, CRE's limit of liability would "not exceed the highest applicable limit of liability under any one policy," which, of course, was $250,000.00.
On September 12, 1988, Executrix Koestler's case against CRE and Federal went to trial on the issue of the amount of wrongful death damages, the issues of negligence and causation with respect to UM Raiford long having been conceded. At trial, one hotly-disputed question was the admissibility of Executrix Koestler's expert witness' opinion testimony regarding the net cash value of the life of the deceased. CRE and Federal were insisting that this testimony was not competent and, in their own right, were arguing that the net cash value of Koestler's life was substantially less. The Circuit Court, however, overruled defense objections to Executrix's expert testimony.
Shortly thereafter, and during a recess, the parties entered into settlement negotiations and in due course announced to the Court in chambers a settlement of the wrongful death claim, the essence of which was that the two defendant UM insurers would pay to Executrix Koestler $1,100,000.00, and thus limit their exposure, reserving the right to litigate among themselves their respective ultimate liabilities for this settlement sum, all of which would turn on the stacking issue. Specifically, the Circuit Court reports that the settlement terms included that:
(1) Each of the Defendants would pay $550,000 to the Koestlers;
(2) A judgment would be entered in favor of the Koestlers in the amount of $1,100,000 against the Defendants, and the Defendants would file cross-claims against each other for the purpose of ... [litigating] the limit of liability issue... .
In due course, CRE and Federal filed their cross-claims against each other. CRE claimed  as it had throughout  it owed only the first $250,000.00, the limits of coverage on one UM policy, in consequence of which Federal was responsible for all settlement sums over and above $250,000.00  $850,000.00, to be exact. CRE thus demanded that Federal cough up $300,000.00, over and above the $550,000.00 Federal had paid to Executrix Koestler.
Conversely, Federal took the position Executrix Koestler had been taking all along, that is, that the five CRE UM coverages could and should be stacked, in consequence of which CRE afforded coverage for $1,250,000.00, and since that sum exceeded the settlement amount of $1,100,000.00, CRE should reimburse Federal for the entire $550,000.00 Federal had contributed to the settlement. CRE responded that Federal's $550,000.00 payment to Executrix Koestler had been a voluntary payment for which it was entitled to no indemnity.
The Circuit Court, on January 18, 1989, entered a judgment resolving all issues in favor of Federal and against CRE. In summary, the Circuit Court stated:
... [T]he fact that CRE has a limitation provision in its policy which may be said to be clear and unambiguous is entirely irrelevant. What does matter, and it is the only thing that matters, is that Koestler was charged and paid separate premiums for each endorsement of uninsured motorist coverage in the amount of $250,000 for five vehicles covered by the two policies. Pursuant to the terms of the uninsured motorist statute, CRE is obligated to pay Koestler's heirs all sums which they were entitled to recover from the uninsured motorist as damages for the death of Koestler, whatever that amount might be up to the coverage paid for, $1,250,000.00.
The Court then entered judgment on Federal's cross-claim in the amount of $550,00.00 against CRE and dismissed CRE's cross-claim against Federal with prejudice.
CRE now appeals to this Court.

*1267 III.
Negligently driving uninsured motorists are a plague upon society. They inflict severe losses and at random, losses not in the least less severe that they are less noticed  by the media and legislators  than drunk driving death and damage. Different states have responded to the uninsured motorist menace in different ways. This state's initial response was enactment of the Uninsured Motorist Act of 1966. See Miss. Laws, ch. 524 (1966), originally codified as Miss. Code Ann. § 8285-51, et seq. (1942). That act has been amended and is presently codified as Miss. Code Ann. § 83-11-101, et seq. (1972). The statute's modest remedy has been demonstrably inadequate from the beginning, its required coverage being but the minimum amount required under the Mississippi Motor Vehicle Safety Responsibility Act, so that at the time William D. Koestler purchased his coverages, the UM act required only that:
No automobile liability insurance policy or contract shall be issued or delivered ..., unless it contains an endorsement or provision undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law... .
Those minimum limits at the time were $10,000.00 for damages or losses to any one person and an aggregate of $20,000.00 for all damages or losses caused in a single accident. Miss. Code Ann. § 63-15-11 (1987).
It has for years been a fact of life that many of our citizens and families own more than one automobile, and so we quickly began to find that persons injured by uninsured motorists held multiple UM coverages for which they had paid separate premiums, each of which coverages by its terms afforded protection for the injuries inflicted by the uninsured motorist. See Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879, 884 (Miss. 1989). In the wake of the woeful inadequacy of the statutory minimum coverage, the question gradually arose whether the insured could recover on each of the insurance contracts he held  somewhat as in the case of life insurance or health and accident insurance where an insured or beneficiary often recovers under multiple policies  or whether the insured was limited to a single coverage.
After a false start in Talbot v. State Farm Mutual Automobile Insurance Co., 291 So.2d 699 (Miss. 1974), our cases began to recognize the socioeconomic desirability of stacking. Southern Farm Bureau Casualty Insurance Co. v. Roberts, 323 So.2d 536 (Miss. 1975), allowed an insured to aggregate coverages under three separate policies. Hartford Accident & Indemnity Co. v. Bridges, 350 So.2d 1379 (Miss. 1977), involved a single policy insuring three vehicles upon which three separate coverages were afforded and three separate premiums charged. We allowed stacking. Matters have proceeded apace, and our cases have accepted an ever expanding role for stacking. See, e.g., Thiac v. State Farm Automobile Insurance Co., 569 So.2d 1217 (Miss. 1990); Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879 (Miss. 1989); Brown v. Maryland Casualty Co., 521 So.2d 854 (Miss. 1987); State Farm Mutual Automobile Insurance Co. v. Kuehling, 475 So.2d 1159 (Miss. 1985), and Government Employees Insurance Co. v. Brown, 446 So.2d 1002 (Miss. 1984).
Our theoretical premises, however, have been tentative, as a reading of the cases makes painfully apparent. We have at times construed the liberally-construed contracting language of UM endorsements to provide coverage, finding ambiguities and then resolving those in favor of coverage, and the like. Insurers have responded to our cases (and, no doubt, those of other jurisdictions) by increasingly clear and explicit policy language which precludes stacking. Throughout much of this period, litigants have encountered each other on the premises that the sources of law were but two, statute and contract. What many failed to see  and confessedly our cases were not clear  was that long at work has been the common law principle that contracts contrary to public policy are unenforceable, *1268 no matter how clear or unambiguous they may be. See, e.g., Hertz Commercial Leasing Division v. Morrison, 567 So.2d 832, 834-35 (Miss. 1990), and cases there cited.
And so in Wickline v. United States Fidelity and Guaranty Co., 530 So.2d 708 (Miss. 1988), we approached this third source of law and said:
Stacking is firmly imbedded in our uninsured motorist law. The sort of stacking here sought, i.e., stacking multiple coverages within a single policy, has been mandated in [citing cases]. As with other types of stacking, the rationale offered is that multiple premiums are paid and multiple (stacked) coverages should be available. However, what is important is the fact that stacking has become a positive gloss upon our uninsured motorist act.
Wickline, 530 So.2d at 714. Concededly, in Wickline we tethered our holding to the act, as we declared in the end:
[A]s a matter of positive law ... that all classes [of] statutory insureds may recover of the UM insurer all amounts he or she may be entitled to recover as damages from the uninsured motorist, limited only by the limits of the UM coverage multiplied by the number of vehicles insured in the policy.
Wickline, 530 So.2d at 715. Read reflectively, Wickline strongly implies common law limits on contracts against public policy.
Today's issue is implicit in Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879 (Miss. 1989). Cossitt arose out of an accident occurring on April 10, 1984, covered by a liability insurance policy which provided uninsured motorist coverage in the amount of $25,000.00 on each of three separate vehicles, upon which the insured had paid three separate uninsured motorist premiums. At the time, the statutorily required minimum limits of liability required to be included in uninsured motorist coverages in all policies was $10,000.00 per person and $20,000.00 per occurrence. At least a portion of the UM coverage Nationwide had written in the Cossitt case was in excess of that statutorily required. Cossitt, 551 So.2d at 883-84, held three $25,000.00 coverages should be stacked but concentrated on other "stacking" issues and did not expressly address or decide the point now before us. We have thus stopped short of expressly deciding whether uninsured motorist coverages in excess of the minimum mandated by statute may be stacked to the extent of the excess.

B.
In the wake of our caselaw, CRE concedes  as it must  that it has a minimum liability on each of the five coverages of $10,000.00, or an aggregate of $50,000.00, and it concedes that this point has been settled at least since Lowery v. State Farm Automobile Insurance Co., 285 So.2d 767 (Miss. 1973). CRE concedes as well that it has by contract obligated itself in excess of this minimum obligation, in that it has written UM coverage with a $250,000.00 limit of liability. Beyond this, CRE presents the question whether it must stack in its insured's favor UM coverages in excess of the minimum statutory requirement for each vehicle, and in excess of the contractual limit of liability for one such coverage. CRE presents this question against the backdrop of unmistakable language in each of the two policies, applicable to each of the five coverages Koestler held, that its liability be limited to the maximum limit of liability under any one coverage, i.e., $250,000.00.[2] There is simply nothing ambiguous about this policy language.
*1269 In support of its view, CRE, not inappropriately calls our attention to our several cases holding that medical payment coverages in uninsured motorist insurance policies are not subject to stacking. See, e.g., State Farm Mutual Automobile Insurance Co. v. Acosta, 479 So.2d 1089 (Miss. 1985); State Farm Mutual Automobile Insurance Co. v. Scitzs, 394 So.2d 1371, 1372-73 (Miss. 1981); see also, Tucker v. Aetna Casualty & Surety Co., 609 F. Supp. 1574, 1580 (S.D.Miss. 1985). CRE points to the fact that medical payment coverages are not statutorily required, and that we have in that area allowed private lawmaking to prevail; that is, unambiguously worded policy provisions may limit medical payment coverages to a single coverage, notwithstanding that there are multiple coverages and that the insured has paid a separate premium for each UM medical payment coverage. It does not follow, however, that only statutorily required UM liability coverages are subject to stacking.
On reflection, it is apparent that the social problem of negligently inflicted but otherwise uninsured injuries to innocent persons is not nearly so great in the context of the medical payments coverage as it is in the setting of uninsured motorist liability coverage. Indeed, in most policies, including those here, the fact that medical payments coverages cannot be stacked often becomes irrelevant in view of the fact that the larger limits uninsured motorist coverages protect against the same loss. Substantial, though concededly incomplete, public and group private medical coverages are often available as well. The rule of Acosta and Scitzs, though superficially analogous, need not control.
Without further ado, we make explicit what is only implicit in a combined reading of Wickline and Cossitt: in the case of multiple UM coverages or policies, where the insured has paid and the insurer has received a separate premium, the insured may stack and thus recover on each such coverage or policy otherwise according to its terms, notwithstanding that the limits of liability exceed the statutory minimum. Any language in any such coverage or policy to the contrary is a contract against public policy and is, thus, unenforceable. The Circuit Court correctly held on today's facts that CRE's five Koestler UM policies should be stacked and read to afford coverage for wrongful death damages caused by UM Raiford up to, but not to exceed, $1,250,000.00.

IV.
By way of defense to Federal's cross-claim, CRE asserts that Federal was a "volunteer" in its $550,000.00 payment to Executrix Koestler. CRE seizes on the fact that Federal has labeled its cross-claim one for indemnity and invokes the familiar rule that volunteers may not recover indemnity. See, e.g., Keys v. Rehabilitation Centers, Inc., 574 So.2d 579, 584-86 (Miss. 1990); Southwest Mississippi Electric Power Association v. Harragill, 254 Miss. 460, 468, 182 So.2d 220, 223 (1966). There is no reason to pursue this avenue, however, as Federal's cross-claim is not one in formalistic, implied indemnity. Federal is trying to get its money back via litigation of the merits of the stacking issue, and we think it clear the parties had a deal Federal might pursue this course.
Our procedural and factual contexts are important. From the beginning of Executrix Koestler's action, CRE and Federal were engaged in a dog fight between themselves, while both sought to contain the wrongful death damage exposure each clearly had. The bone of contention has at all times been the stacking question and, *1270 hence, the limits of CRE's liability. No one suggests that Federal's coverage has ever been anything other than excess or secondary, nor that CRE's UM coverage was other than primary. The CRE-Federal dispute throughout centered around CRE's claim that our stacking law did not reach this case and, hence, the limit of its liability to Executrix Koestler was $250,000.00. Federal all the while was insisting CRE's coverages were subject to stacking and that Federal had no liability to Executrix Koestler until all five $250,000.00 CRE coverages had been exhausted.
The dispute remained in this posture well into the trial of the principal claim and until the time that the Circuit Court allowed Executrix Koestler to place before the jury expert opinion evidence that the net cash value of decedent's life was $2,016,899.00. Considering that provable wrongful death damages may also have included loss of society and companionship and, as well, loss of the value of continuing to live, see Jones v. Shaffer, 573 So.2d 740 (Miss. 1990); McGowan v. Estate of Wright, 524 So.2d 308 (Miss. 1988), and, as well, that the fault of UM Raiford was without dispute, CRE and Federal were each at substantial risk. It was in this setting that CRE and Federal prudently placed a cap on their aggregate exposure by negotiating a settlement with Executrix Koestler for $1,100,000.00.
At the time, CRE and Federal agreed that they would leave open for future litigation their relative liabilities. What CRE and Federal contemplated in this further litigation is made clear in their written understanding:
(5) Upon finally [sic] judicial conclusion by the highest review in [sic] Court, Federal and/or CRE will reimburse the winner consistent with the judicial determination  that is to say if it is
determined that CRE has $1,250,000 in coverage, they will reimburse Federal the full $550,000 they have contributed to the settlement. Likewise, if it is determined CRE has only $250,000 in uninsured motorist coverage, then, in that event, Federal will reimburse CRE sums paid in excess of that amount.
What has led one and all down the present rabbit trail is that the agreement refers to the fact that, after the settlement with Executrix Koestler,
... the defendants will then file cross-claims for indemnity ... seeking a judicial determination of the amount of uninsured motorist coverage provided by CRE's various policies, and hence the retained limit under the Federal policy. [Emphasis supplied]
What is controlling here is that CRE and Federal had an agreement, the substance of which is beyond dispute. That agreement called for the parties to pay off Executrix Koestler, serve their mutual advantage by capping their potential exposure, and then litigate among themselves over the point that had separated them from the beginning. Common sense suggests this to the advantage of each. Assuming the worst, each was saving $150,000.00 off its maximum potential exposure. It makes no sense that Federal should have been forced to endure the hazards of trial by jury as a condition of litigating the merits of the reserved stacking issue. See Keys v. Rehabilitation Centers, Inc., 574 So.2d 579, 584 (Miss. 1990); Mississippi Farm Bureau Mutual Insurance Co. v. Garrett, 487 So.2d 1320, 1323 (Miss. 1986). The fact that Federal styled its cross-claim for indemnity in no way misled CRE. Cf. Cook v. Board of Supervisors of Lowndes County, 571 So.2d 932, 934 (Miss. 1990), (technically erroneous label not controlling where intended substance is apparent); Moore v. Moore, 451 So.2d 226, 227 (Miss. 1984). Our review of the record leaves us without doubt that CRE understood the substantive issue to be litigated on the cross-claim was whether CRE's five coverages could be stacked.
Notwithstanding, CRE seizes on Federal's use of the word "indemnity" and treats the point as though all else thereupon became straitjacketed, that indemnity had become a form of action. CRE misreads the word. What  and all  it means in this setting is that Federal was trying to get its money back, a procedural course it reserved. *1271 The CRE-Federal settlement was as much of a deal with each other as it was with Executrix Koestler. We reject CRE's defense on grounds of the parties' actual agreement and if there be loose ends around the edge, equitable estoppel is more than adequate to fill in the gaps. See, e.g., Koval v. Koval, 576 So.2d 134, 137-38 (Miss. 1991); PMZ Oil Co. v. Lucroy, 449 So.2d 201, 206-08 (Miss. 1984).
Therefore, I would affirm.
McRAE, J., joins this dissent.
BANKS, Justice, dissenting:
I dissent from the majority holding. I write separately to explain that I find no justification for this view in any distinction between medical coverage and uninsured motorist coverage nor "public policy" unanchored in statutory provisions. In my view our prior stacking decisions and the statute requiring coverage in the amount of liability coverage at the insured's option compel this result.
Today's majority has concluded that under the facts of this case, Casualty Reciprocal Exchange (CRE) was liable to the representatives of its insured, William Koestler, for $250,000. In reaching this conclusion, the majority has necessarily held that where an insurance company collects separate premiums for uninsured motorist coverage on each of multiple cars that it insures for one individual, that insurance company is free to limit its uninsured motorist liability to the amount it was contractually obligated to pay under the coverage for only one of those cars, so long as that amount at least equals the product of the mandated statutory "minimum" amount per car times the number of cars insured. The problem is that it accepts as the minimum amount the amount set forth in Miss. Code Ann. § 63-15-3. This result is clearly contrary to the express provisions of the Mississippi Uninsured Motorist Act. Miss. Code Ann. § 83-11-101 (1991). Furthermore, this result is not supported by this Court's prior decisions in this area.
Mississippi Code Annotated, Section 83-11-101 (1991), expressly provides:
No automobile liability insurance policy or contract shall be issued or delivered after January 1, 1967, unless it contains an endorsement or provision undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law, as amended, under provisions approved by the Commissioner of Insurance; however, at the option of the insured, the uninsured motorist limits may be increased to limits not to exceed those provided in the policy of bodily injury liability insurance of the insured or such lesser limits as the insured elects to carry over the minimum requirement set forth by this section. The coverage herein required shall not be applicable where any insured named in the policy shall reject coverage in writing and provided further, that unless the named insured requests coverage in writing, such coverage need not be provided in any renewal policy where the named insured had rejected the coverage in connection with the policy previously issued to him by the same insurer.
Miss. Code Ann. § 83-11-101 (1991). Clearly, there is an inconsistency between the CRE limitation and the provision of § 83-11-101 that the insured be given the opportunity to purchase as much uninsured coverage as he wishes up to the limit of his liability insurance. On cars two, three, four, and five, CRE really restricted Mr. Koestler to purchasing $250,000 of liability insurance and $0 uninsured motorist coverage. He had no opportunity to purchase real uninsured motorist coverage above this amount. If insurance companies are allowed to cap the amount of real uninsured motorist coverage that individuals may purchase like this, the "option" provision of § 83-11-101 is effectively rendered a nullity.
On numerous occasions this Court has observed that uninsured motorists insurance is designed to provide innocent injured motorists a means of compensation for injuries *1272 which they received at the hands of an uninsured motorist. See, e.g., Wickline v. U.S. Fidelity and Guaranty Co., 530 So.2d 708, 711 (Miss. 1988); Harthcock v. State Farm Mutual Ins. Co., 248 So.2d 456, 460-61 (Miss. 1971). This Court has further noted that the Uninsured Motorist Act must be liberally construed to achieve this purpose. Wickline v. U.S. Fidelity & Guaranty Co., at 711; Stevens v. USF & G Co., 345 So.2d 1041 (Miss. 1977); Parker v. Cottonbelt Ins. Co., Inc., 314 So.2d 342 (Miss. 1975); Lowery v. State Farm Mutual Ins. Co., 285 So.2d 767 (Miss. 1973); Hodges v. Canal Ins. Co., 223 So.2d 630 (Miss. 1969). Pursuant to this goal, this Court has consistently applied the rule of construction that any insurance policy provision which has the effect of reducing the coverage required by § 83-11-101 will be held unenforceable. Wickline at 712; Lowery at 770.
Given the clear inconsistency between the CRE limitation and the mandate of § 83-11-101, our historical rule of construction in the uninsured motorists context will tolerate only one result. Where William Koestler paid full, separate premiums for each of the five cars he insured with CRE, CRE's limitation must be struck down, unless CRE can show that William Koestler expressly refused in writing to purchase an amount of uninsured motorist coverage up to the limits of his liability insurance carried with CRE. Section 83-11-101 must be construed to require active refusals of the maximum coverage in such circumstances by insureds, if § 83-11-101 is to retain any meaning of limitations on liability like the one here at issue.
The Florida courts adopted this same position it the 1978 case of Lumbermen's Mutual Casualty Co. v. Beaver, 355 So.2d 441 (Fla. Dist. Ct. App. 1978). Florida's uninsured motorist act bore language which is substantially similar to that used in Mississippi's current uninsured motorists act. Beaver at 443. The Florida required that insureds be provided with uninsured motorist coverage up to the amount of liability insurance that they carried or to such lesser extent that the insured agreed to in writing. Id. The Florida Court expressly held that there was a requirement that coverage be provided to the extent of liability insurance, unless the insured rejected in writing. Id. The court's rationale for its holding was that the language of the statute could not be complied with unless the insurance company had informed the insured of his option that the insured thereafter expressly rejected the opportunity to take out such coverage in excess of the statutory minimum. Id. at 443-44.
No less is demanded of insurance companies under Mississippi's current law. Where William Koestler paid separate premiums for the uninsured motorist coverage of each of the five cars that were insured by CRE, it should be presumed that he has uninsured motorist coverage to the extent of his liability coverage on each car (i.e. $250,000), unless CRE can show that William Koestler rejected in writing such coverage. In this case, that amount would be $250,000 per car.
In Johnston v. Safeco Ins. Co. of America, 727 F.2d 548 (5th Cir.1984), the United States Court of Appeals for the Fifth Circuit held that the Mississippi uninsured motorist statute does not mandate that uninsured coverage limits equal liability limits. Johnston at 550. In that case, the insured and two passengers in his automobile were injured when the insured's automobile was struck by two uninsured vehicles. Id. at 549. The insured had one policy with Safeco Insurance with liability limits of $25,000 and $50,000 per accident. The policy contained the limitation that coverage for uninsured motorist insurance be limited to the statutory minimums of $10,000 per person and $20,000 per accident. Id. The insured Johnston made the argument that in the absence of an express rejection on his part of uninsured motorist coverage up to the extent of his liability coverage, he should receive uninsured motorist coverage equal to his liability coverage limits of $25,000 per person and $50,000 per accident. Id. at 550. The Fifth Circuit said the Mississippi statute did not mandate this result. Id.
First, it should be noted that the instant Casualty Reciprocal Exchange case is the first time the Mississippi courts have spoken *1273 on this issue and that the decision of the Fifth Circuit on this matter is not binding in any way upon this Court. Second, the Johnston decision was based on the holding of the 1974 case of Talbot v. State Farm Mutual Auto Ins. Co., 291 So.2d 699 (Miss.), which itself was based on law that has since been significantly amended. The Talbot court held that under § 83-11-101, the only mandatory uninsured motorist coverage is that set forth in the Mississippi Uninsured Motorist Safety Responsibility Law. Talbot at 701. Talbot was decided before the 1980 amendments including the insured's option to purchase additional uninsured motorist coverage, however. Talbot was overruled on this issue to the extent that the 1980 amendment required that insured be given to option to purchase as much uninsured motorist coverage as they wished up to the extent of the liability coverage that they carried. See Miss. Code Ann. § 83-11-101 (1991). Therefore, any decision which relies on Talbot for the proposition that § 83-11-101 articulates no mandates beyond statutory minimum coverages is erroneous.
The majority in this case has conceded that Mississippi case law pertaining to stacking dictates that CRE provide coverage on each of Mr. Koestler's five uninsured motorist policies up to the extent to the statutory minimums. Beyond the point of those statutory minimums, it says that our case law requires that insurers be given the freedom to contract as they wish. In Mississippi's seminal stacking case of Government Employees Ins. Co. v. Brown, 446 So.2d 1002 (Miss. 1984), this Court held that where an insured had paid separate premiums for the uninsured motorist coverage of three automobiles under one policy, the insured's coverage could not be limited by a clear and unambiguous "limits of liability" clause which attempted to prevent the aggregating of coverage. Brown at 1006. The Court rested its holding in large part on a finding that it was unconscionable for an insurer to prevent stacking where it had accepted separate premiums on each of the cars. Id. The Court's enunciated rationale had nothing to do with statutory "minimum" requirements. Id. Why would it? Is it any less unconscionable for an insurer to accept premiums and provide no coverage pursuant thereto for amounts above the statutory minimum requirements as opposed to the amount of the statutory minimums? Furthermore, this Court has never recognized an absolute freedom of contract for coverage amounts above the statutory minimum. Wickline v. U.S. Fidelity & Guaranty Co., provides a clear exposition of Mississippi's rule regarding freedom of contract in this context:
Section 83-11-101 allowed insurers to contract with regard to excess coverage so long as the Mississippi rules regarding exclusion and stacking are not violated.

Clearly, the limitation in the CRE policy runs counter to this state's long-held position that where separate premiums are paid, separate coverage must be provided in return. Furthermore, as mentioned above, allowing such limitations would render the "option" provision of § 83-11-101 a nullity. Without question, this violates Mississippi's long-held rule of construction in this context. For all of the reasons set out above, I dissent.
DAN M. LEE, P.J., and SULLIVAN and McRAE, JJ., join this dissent.
McRAE, Justice, dissenting:
While I concur with Justice Sullivan's dissent, I write separately to emphasize several points discussed therein.
To enforce the provision of the CRE policy which limits stacking of uninsured motorist coverage to the minimum amount per vehicle mandated by Miss. Code Ann. § 63-15-11 (1987) would serve only to invite insurers to further utilize increasingly unambiguous and far-reaching limitations in their policies. I recognize that insurance companies are free to contract, as long as the minimum coverage afforded by the statute is not restricted. Harris v. Magee, 573 So.2d 646, 652 (Miss. 1990); Wickline v. United States Fidelity and Guaranty Co., 530 So.2d at 708, 717 (Miss. 1988); State Farm Mutual Automobile Insurance Co. v. Nester, 459 So.2d 787, 789 (Miss. 1984); *1274 State Farm Mutual Automobile Insurance Co. v. Talley, 329 So.2d 52, 54 (Miss. 1976). However, this freedom to contract does not give the insurance company license to offer coverage in excess of that required by the statute on the front page of a policy declaration and then quietly spirit away the benefits of that same coverage in the fine print of an exclusionary provision on the back of the page. This is contrary to public policy and to the letter and spirit of the Mississippi Uninsured Motorist Act, Miss. Code Ann. § 83-11-101 (1972). Any such restriction is the province of the legislature, not the insurance company.
We must not forget that the freedom to contract belongs also to the insured. It is the insured who is in the inferior bargaining position. Mr. Koestler, an insurance agent, contracted with CRE for uninsured motorist coverage for each of his five vehicles. He paid five separate premiums in hopes of obtaining adequate coverage against uninsured motorists for his family. We have held that when multiple premiums are paid, multiple stacked coverages should be available. Wickline, 530 So.2d at 714. As we further stated in Wickline, "all classes [of] statutory insureds may recover of the UM insurer all amounts he or she may be entitled to recover from the uninsured motorist, limited only by the limits of the UM coverage multiplied by the number of vehicles insured in the policy." Id. at 715 (emphasis added). Reading Wickline together with Cossitt v. Nationwide Mutual Insurance Co., 551 So.2d 879 (Miss. 1989) wherein we upheld the stacking of coverage of three separate vehicles, each covered by an uninsured motorist policy in the amount of $25,000.00, the dissent correctly observes that:
[I]n the case of multiple UM coverages or policies, where the insured has paid and the insurer has received a separate premium, the insured may stack and thus recover on each such coverage or policy otherwise according to its terms, notwithstanding that the limits of the liability exceed the statutory minimum. Any language in any such coverage or policy to the contrary is a contract against public policy and is, thus, unenforceable.
To hold otherwise would offer insurance companies the unfettered freedom to whittle away the already limited bargaining power of the insured, leaving those who seek greater protection than that afforded by the statute captive to its inadequacies.
Most insurance companies will not sell liability policies in excess of $500,000.00 unless the insured states in advance that he rejects uninsured motorist coverage. Thus, the insured, under today's decision, will be limited to maximum coverage of $500,000.00 for himself or his family. This is not the purpose or intent of mandatory uninsured motorist coverage in a liability policy. After today's decision, the only alternative for the insured will be to obtain policies with separate insurance companies. However, that door, too, will probably soon be shut. Accordingly, I dissent.
SULLIVAN and BANKS, JJ., join this opinion.
NOTES
[1] The policy language at issue reads as follows:

LIMIT OF LIABILITY
The limit of bodily injury liability shown in the Declarations for "each person" for Uninsured Motorist Coverage is our maximum limit of liability for all damages for bodily injury sustained by any one person in any one accident. Subject to this limit for "each person," the limit of bodily injury liability shown in the Declarations for "each accident" for Uninsured Motorists Coverage is our maximum limit of liability for all damages for bodily injury resulting from any one accident. The limit of property damage liability shown in the Declarations for "each accident" for Uninsured Motorists Coverage is our maximum limit of liability for all damages to all property resulting from any one accident. This is the most we will pay regardless of the number of:
1. Covered persons;
2. Claims made;
3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident.
The policies also contained the following provision:
If this policy and any other auto insurance policy issued to you by us apply to the same accident, the maximum limit of our liability under all the policies shall not exceed the highest applicable limit of liability under any one policy.
[2] Following its prescription of mandatory minimum coverage, Section 83-11-101(2) reads:

however, at the option of the insured, the uninsured motorist limits may be increased to limits not to exceed those provided in the policy of property damage liability insurance of the insured or such lesser limits as the insured elects to carry over the minimum requirement set forth by this section.
Thus, the insured is not required to purchase excess UM coverage but may, if he wishes  and if the UM insurer is willing to sell it to him. Nothing in the Act requires an insurer to sell an insured more than minimum coverage.
[1] Both versions of this opinion were authored by Robertson, J.
[2] The policy language at issue reads as follows:

LIMIT OF LIABILITY
The limit of bodily injury liability shown in the Declarations for "each person" for Uninsured Motorist Coverage is our maximum limit of liability for all damages for bodily injury sustained by any one person in any one accident. Subject to this limit for "each person," the limit of bodily injury liability shown in the Declarations for "each accident" for Uninsured Motorists Coverage is our maximum limit of liability for all damages for bodily injury resulting from any one accident. The limit of property damage liability shown in the Declarations for "each accident" for Uninsured Motorists Coverage is our maximum limit of liability for all damages to all property resulting from any one accident. This is the most we will pay regardless of the number of:
1. Covered persons;
2. Claims made;
3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident.
The policies also contained the following provision:
If this policy and any other auto insurance policy issued to you by us apply to the same accident, the maximum limit of our liability under all the policies shall not exceed the highest applicable limit of liability under any one policy.