# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-01130-SCT

*JAMES EDGAR WALLEY, II, INDIVIDUALLY AND IN HIS CAPACITY AS THE ADMINISTRATOR OF THE ESTATE OF TIFFANY LEIGHANN WALLEY, DECEASED; CARL RAY SIMMONS, INDIVIDUALLY AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF NATASHA NICOLE SIMMONS, DECEASED; CHRISTOPHER KEECH, A MINOR, BY AND THROUGH HIS MOTHER, NATURAL GUARDIAN AND NEXT FRIEND, BARBARA ANN KEECH; NATHAN DANIEL WELLIVER, A MINOR, BY AND THROUGH HIS MOTHER, NATURAL GUARDIAN AND NEXT FRIEND, LINDA WELLIVER; AND LINDA WELLIVER, INDIVIDUALLY*

*v.*

*COREGIS INSURANCE COMPANY AND MISSISSIPPI EDUCATIONAL RISK COOPERATIVE*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/9/2000 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | WAYNE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | KEVIN LEWIS |
| | A. E. (GENE) HARLOW |
| | STANFORD YOUNG |
| ATTORNEYS FOR APPELLEES: | THOMAS A. WALLER |
| | ROBERT ELLIOTT BRIGGS |
| | VICKI R. LEGGETT |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 05/09/2002 |
| MOTION FOR REHEARING FILED: | 5/23/2002; denied 8/8/2002 |
| MANDATE ISSUED: | 8/15/2002 |

**BEFORE PITTMAN, C.J., EASLEY AND GRAVES, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. This case involves an appeal from the Wayne County Circuit Court, where Coregis Insurance Company (Coregis) and Mississippi Educational Risk Cooperative (MERC) were granted summary judgment as to all of the claims against them for uninsured motorist benefits brought by the "Children", Tiffany Leighann Walley (Walley), deceased, age 13; Natasha Nicole Simmons (Simmons), deceased; Christopher Keech (Keech) age 11; and Nathan Daniel Welliver (Welliver), age 17. The Wayne County Circuit Court determined that: (1) Kenneth Kirkwood (Kirkwood), a minor, the alleged tortfeasor in the case, was not underinsured, as that term has been defined by the applicable statutes and case law and the relevant Coregis policy, and (2) that the four children injured or killed in the accident involving Kirkwood were not using the Wayne County school bus, as that term has been defined by the applicable case law.

¶2. The lawsuit was originally filed on November 13, 1998, for the wrongful death of Walley, although four (4) were injured or killed as a result of the same incident. Kirkwood was thereafter dismissed following a policy limit settlement agreement as to the claims of all four children and/or their representatives and wrongful death beneficiaries. The other three children, Simmons, Keech, and Welliver, were allowed to intervene in the case on April 20, 1999, due to common issues of fact and law. The Wayne County School District (District) was also thereafter dismissed by agreement of the parties following a stipulation of fact concerning the District's lack of responsibility for certain self-insured retention provisions of the Coregis insurance policy.

¶3. The trial court stayed all discovery except as related to the coverage issues. The parties conducted extensive discovery on the coverage issues including interrogatories, requests for production and numerous depositions concerning the relevant facts. Coregis then moved for summary judgment claiming that the alleged tortfeasor was not an insured or underinsured motorist as to the subject incident and victims.

¶4. On February 4, 2000, Coregis filed a motion for summary judgment, arguing that irrespective of the use question, the Children were not entitled to any uninsured motorist benefits from Coregis because there was not an underinsured situation. Coregis argued that using the "limits versus limits" procedure announced by this Court and contained in the Coregis policy, Kirkwood did not qualify as an underinsured motorist.

¶5. Shortly after Coregis's first motion for summary judgment was filed, a letter was sent by the trial court to all parties, informing the parties that it was prudent and wise to rule on both the coverage and use issues rather than piecemeal the issues. Responding to the trial court's request, on March 16, 2000, Coregis filed its second motion for summary judgment, said motion solely related to the use question. Coregis argued that simply waiting at the bus stop was not enough to begin use. Specifically, Coregis asked the trial court to determine that use of a school bus could not begin until the bus has actually arrived at the bus stop and activated its emergency signaling equipment thereby placing the child within the zone of protection of the bus.

¶6. The motions were heard on May 17, 2000, and on June 12, 2000. In addition to concluding that Kirkwood was not an underinsured motorist, the trial court further concluded that the four children were not using the school bus at the time of the accident. The trial court determined that "there may be disputes about whether the children were at the correct bus stop, about whether the children ever arrived at the bus stop early and about whether the bus driven by Arbuties Taylor (Taylor) ever arrived early." The trial court also stated that, "What there is no dispute [over], however, is that the bus driven by Taylor and scheduled to pick up the four children involved in the accident was not in sight at the time of the accident, had not

stopped to pick up the children, had not activated its flashing lights and was as much as 11 minutes away from the bus stop." The trial court determined that "simply waiting at the bus stop, without more, is not enough to begin 'use' of a school bus."

¶7. More specifically, the trial court concluded as follows:

> To be clear, this ruling is based not on the amount of time away the school bus was from the bus stop, but instead on the simple fact that the bus had not arrived nor was the bus in sight and arriving at or leaving the bus stop. In this manner, the bus was not in sight, so there could be no 'close spacial proximity to the insured vehicle' and the children could hardly have been preparing to board a bus that was not even in sight.

¶8. As a result, summary judgment on the question of both the coverage and use was granted to Coregis and MERC. From this adverse ruling, the Children timely appeal to this Court.

### FACTS

¶9. On the morning of October 14, 1997, a vehicle driven by Kirkwood struck and killed Walley and Simmons, and injured Keech and Welliver. The police report indicates that the time of the collision was 7:25 a.m. and that the police arrived on the scene at 7:31 a.m. The first call to 911 occurred at 7:28 a.m.

¶10. Welliver, one of the injured Children, testified that he had been instructed to be at the bus stop between 7:15 a.m. and 7:45 a.m. to catch the bus when he first became a student at Wayne County High School. He testified that, prior to the collision, the bus arrival time varied from day to day between 7:15 a.m. and 8:05 a.m. He testified that the other three Children lived near him so they normally waited for the bus together. These Children normally congregated together with the bus driver's approval to wait for the bus.

¶11. On the date of the collision, Welliver left his house between 7:13 a.m. and 7:15 a.m. He identified the location of the bus stop by photograph and testified that all four of the Children were standing at that location when the collision occurred. The collision occurred at approximately 7:25 a.m., according to the accident report. The trial court found that 7:25 a.m. was "the best estimate available" as to the time the collision occurred. The bus stop was located at approximately 1004 Court Street in Waynesboro. The bus was scheduled to arrive at 7:36 a.m.

¶12. Simmons and Keech left their home at approximately 7:20 a.m., on the morning of the collision. Their mother, Barbara Ann Keech, watched them walk to their normal bus stop. They went to the bus stop that day just like normal. The collision occurred about five minutes after they left the house. No one knows the exact time the school bus arrived at this bus stop on the day of the collision, but it arrived at approximately the same time as the ambulances arrived. The exact location of the bus at the time of the collision was not known.

¶13. Representatives of the District testified and agreed that a student cannot board a school bus on a route without being at a bus stop. The District had in force two student handbooks, one for grades K-8 and one for the high school, and a handbook for bus drivers. Each of the three handbooks forbids certain listed student misbehavior aboard a school bus "or at an authorized bus stop." The District, therefore, testified and agreed that it does exercise control over students while they are at a bus stop. None of the Children were ever accused of any misbehavior at a bus stop or otherwise. No one denied that these Children were at an

authorized bus stop when the collision occurred.

¶14. At the time of the aforesaid collision, Kirkwood had automobile liability insurance with coverage limits of $100,000.00 per injured person and $300,000.00 maximum per accident. Kirkwood was released from further liability upon payment of the policy limit by his insurance carrier. Each of the injured Children, individually or through their estates and heirs, received one fourth of the policy limit in the amount of $75,000.00 each.

¶15. At the time of the aforesaid collision, all of the vehicles owned by the District were insured under a policy of automobile liability insurance issued by Coregis. The District owned approximately 95 vehicles covered by this Coregis policy.

¶16. The declarations page of the aforesaid insurance policy names MERC as the insured. MERC is a cooperative, composed of 28 school districts. MERC maintained separately a list of all vehicles covered by the policy. The Coregis policy covered 1,499 vehicles owned by all 28 insured county school districts.

## DISCUSSION

### I. Whether the Children were using the bus so as to entitle them to uninsured motorist benefits.

¶17. On appeal, the Children raise the primary question of how far can the definition of "use" be stretched. The Children argue that the definition of use should be extended to include the situation where the school bus was not in sight at the time of the accident.

¶18. The Children reference the most relevant cases from this Court on this issue. The first case is ***Stevens v. United States Fid. & Guar. Co.***, 345 So.2d 1041 (Miss. 1977). In ***Stevens***, Stevens was employed as the operator of a wrecker truck. His duties included responding to requests for a wrecker by proceeding to the scene of an accident to secure a disabled vehicle with his truck and to return the damaged vehicle to his employer's premises. ***Id***. at 1042.

¶19. On the night of his injuries, Stevens was called to the scene of an accident to remove from the highway a truck which had been involved in an accident. He attached the damaged vehicle to his truck and pulled the truck off the highway. He then exited his vehicle, leaving the motor running and all emergency lights on while he sweep the debris off the highway with a broom. ***Id***. As he started back towards his truck, Stevens was struck by an uninsured motorist, while approximately six to eight feet from his truck. ***Id***.

¶20. This Court stated that the case would be decided by determining whether Stevens was using his truck at the time he was struck. The Court concluded that use of a vehicle within the meaning of the uninsured motorist statute is dependent upon the facts of each case. ***Id***. at 1043. This Court determined that Stevens was using the vehicle at the time he was struck. ***Id***. Stevens had driven the vehicle to the accident site and had temporarily exited the vehicle only to perform functions of his employment by using the emergency equipment of his truck. ***Id***. at 1044.

¶21. The next significant case interpreting the definition of use was ***Harris v. Magee***, 573 So.2d 646 (Miss. 1990). ***Harris*** involved an employee of a construction company dispatched to a job site transporting a self propelled crane to the site. While in route to the site, the crane encountered mechanical difficulties. Larry Magee was one of the employees following behind in another company owned vehicle.

*Harris*, 573 So.2d at 648. As Magee was crawling from beneath the crane, he was struck and killed by an uninsured motorist, Minor Harris. Magee's representatives sought to recover uninsured motorist benefits from his company's insurance carrier. The Court determined that coverage was available finding that Magee was performing duties directly related to the use of the insured vehicle when struck by the uninsured motorist. *Id*. at 651.

¶22. Coregis argues that the definition of use has boundaries. Specifically, Coregis notes that in both *Stevens* and *Harris*, the use of the employer's vehicles was not too remote. In each case, the employees had only recently exited a vehicle that was still accessible.

¶23. The third case, heavily relied on by the Children, is *Johnson v. United States Fid. & Guar. Ins. Co.*, 726 So.2d 167 (Miss. 1998). This case involves a child injured while walking to catch his stopped and waiting school bus.

¶24. Johnson was struck by an uninsured motorist while he was walking from his home to board a school bus parked 141 feet away. The uninsured motorist proceeded through an intersection in spite of the presence of the parked school bus with its stop sign and lights displayed. *Johnson*, 726 So.2d at 167. This Court stated:

> Moreover, it is certainly arguable that Johnson was 'using' the school bus in the present case to a greater extent than Magee was 'using' his truck while he was repairing the crane which he was escorting in *Harris*. Johnson was 141 feet away from the school bus, but all indications are that he was walking to the bus in order to ride it to school, and his actions were thus directed towards the vehicle itself.

*Johnson*, 726 So.2d at 169.

¶25. Despite finding coverage in *Johnson* the Court, however, expressed concern about the difficulty in establishing parameters for the future scope of the term "use." Significantly, this Court stated:

> Clearly, not all preparations to board a covered vehicle, no matter how remote, should be held to constitute 'use' of the vehicle in question. Nevertheless, the courts are fully capable of establishing reasonable parameters in this regard, and the difficulty of proving use of a covered vehicle in some cases should not lead this Court to draw artificial and arbitrary distinctions in all cases.

*Johnson*, 726 So.2d at 169.

¶26. The language contained in *Stevens*, *Harris* and *Johnson* clearly indicates that the word "use" has some limitations thereby allowing the courts to establish reasonable boundaries in this context. *Johnson* is clearly distinguishable from the present case. In the case at hand, the school bus was not parked with its stop sign out and its lights flashing. The school bus was not even in the area of the accident at the time the four Children were struck by Kirkwood.

¶27. Coregis argues that once the school bus stops and flashes its lights, a child has begun the boarding process. If the child is then struck before entering the bus, the child is still considered within the zone of the protection of the bus and thus is a user of the bus.

¶28. In the case sub judice, the Children argued that they had already completed their first boarding

preparation by walking to the bus stop. These Children rode the bus to school practically every day. Therefore, the Children contend that their wait at the bus stop constituted a normal and necessary use.

¶29. The Children contend that the district exercised control and authority over these students while at the bus stop, regardless of the status of the bus in route; and therefore, since these students were under the control and authority of the district, they were also under the protection of the district. The focus of the Children's argument is that these students were in a zone of protection created by the District while at the bus stop and, therefore, are entitled to all protective measures in force and applicable at that time. Specifically, the Children allege that it can be inferred that since the District bought the coverage for its bus user students, the District, therefore, intended to cover the students while they are actually under the control and authority of the District.

¶30. While this Court in *Johnson* recognized liberal interpretation of what constitutes use, it is still not without limitation. The Court stated:

> One difficulty which might arise in future cases is the establishment of parameters for the scope of the term "use." Clearly, not all preparations to board a covered vehicle, no matter how remote, should be held to constitute "use" of the vehicle in question. Nevertheless, the courts are fully capable of establishing reasonable parameters in this regard, and the difficulty of proving use of a covered vehicle in some cases should not lead this Court to draw artificial and arbitrary distinctions in all cases.

*Id*. at 169. Therefore, the Court is left with the capability to establish reasonable parameters. *Id*.

¶31. On appeal, Coregis analyzes several cases from other jurisdictions that have addressed similar factual situations. The first case is from Georgia. In *Roberts v. Burke County Sch. Dist.*, 482 S.E.2d 283 (Ga. 1997), several children, including Roberts, were picked up in the morning at an authorized bus stop, but dropped off after school about one-half mile away, in an unauthorized spot. This was allegedly done at the request of several of the parents, so that the children could arrive home earlier, and had been done for most of the school year without incident. The drop at the unauthorized stop required the children, including Roberts, to walk along a heavily traveled highway with no crosswalks and a 55 mph speed limit to get home. *Roberts*, 482 S.E.2d at 284. On the day he was killed, Roberts suddenly and without explanation attempted to cross the highway without assistance and in an unsafe place, and unfortunately was killed. *Id*. It was undisputed that the school bus had traveled about two miles away from the spot where Roberts was dropped off by the bus. *Id*.

¶32. The Georgia Supreme Court in *Roberts* noted that the Georgia Court of Appeals in *Georgia Farm Bureau Mut. Ins. Co. v. Greene*, 329 S.E.2d 204, 208 (Ga Ct. App. 1985), reasoned that "use" encompassed unloading the children and assuring that they reach a place of safety with the bus "standing guard, with its lights flashing, its stop signals on, and all the visual signals functioning with the disembarking children under its protection." *Roberts*, 482 S.E.2d at 285. That is, in *Greene* the school bus was stopped for unloading when the accident occurred. *Greene*, 329 So.2d at 121. The holding in *Greene*, finding "'use' comports with the realization that in this type of situation, the idea of 'use' does not embrace remoteness." Therefore, the Georgia Supreme Court held no "use" occurred in *Roberts*, acknowledging that "while neither physical nor temporal proximity is in and of itself determinative of the question of remoteness, it is most certainly a factor in the equation." 482 S.E.2d. at 285.

¶33. A similar result was reached by the Georgia Court of Appeals in *Brock v. Sumter County Sch.*

***Dist.***, 542 S.E.2d 547 (Ga. Ct. App. 2000) relying on ***Roberts***. In ***Brock***, a seven-year-old girl was struck and injured while waiting for her school bus to arrive which was approximately ten minutes before its actual arrival time. *Id*. at 548.

¶34. In declining to find "use", the Georgia Court of Appeals stated:

> The [Georgia Supreme] [C]ourt acknowledged that although 'use' of the school bus can reach beyond actual physical contact, and that it encompasses unloading, the accident was so remote physically and temporarily from when the child disembarked, that the accident did not involve use of the bus. Here, the bus had not yet arrived, was not in sight, and the fact that Elizabeth was crossing the road was unrelated to the arrival of the bus... The bus was too remote from the site of the accident as a matter of law for the accident to be considered as arising out of the use of the bus.

***Brock***, 542 S.E.2d at 550 (citing ***Roberts***, 482 S.E.2d at 285).

¶35. In ***Westerfield v. LaFleur***, 493 So.2d 600 (La. 1986), a child was struck and killed while attempting to cross a highway to board her school bus. The child was waiting for the school bus at her house. After the bus arrived, it activated its flashing signals for the child to begin to cross the roadway. *Id*. at 602. The Louisiana court, in rendering its decision, considered applicable state statutes. Under Louisiana statutes, a school bus must be equipped with signal lamps that alternately flash whenever the bus stops or is about to stop for the purpose of receiving or discharging students. Additionally, the driver of another vehicle approaching a school bus which has stopped to pick up or drop off children must stop his vehicle not less than thirty feet from the school bus and not proceed until the flashing signal lights are turned off. *Id*. In accordance with this rationale, the Louisiana court decided that the loading and unloading processes are part of the use of the bus, and that the "use starts from the moment the bus stops and signals until the child is safely aboard." *Id*. at 605-06. The court further held that the child was an insured when she was killed "because she was in the process of traversing the roadway under the protection of the law in response to an immobilized signalized school bus with the intention of boarding it for transportation to school." *Id*. at 606.

¶36. In ***Eden Prairie Indep. Sch. Dist. v. Auto-Owners Ins. Co.***, 279 N.W. 2d 358 (Minn. 1979), the Minnesota court acknowledged that the loading and unloading processes were part of the use of the bus, and set out to determine if the loading process had started when the child, Kellie, was struck. The Minnesota court stated:

> Proper procedure for picking up school children requires the driver to actuate the flashing amber prewarning signals at least 100 feet before stopping to load a child and to extend the stop arm and actuate the flashing red lights after stopping. The stop arm must remain extended and the flashing red lights on until the school child has crossed the road and boarded the bus. We believed that the loading process commences when the driver properly turns on the amber prewarning signals as he approaches the boarding point. It terminates when he properly retracts the stop arm and extinguishes the flashing red lights. In the instant case the school bus was 800 feet from the bus stop when Kellie ran into the road and was fatally injured. Although she saw the bus and presumably intended to board it, there is no indication that the driver observed her or that he had initiated the loading procedure. On these facts, we hold that there was no loading of the school bus within the meaning of the Auto Owners policy.

***Eden Prairie Indep. Sch. Dist.***, 279 N.W.2d at 360.

¶37. In ***Newman v. Erie Ins. Exchange***, 507 S.E.2d 348 (Va. 1998), a child was injured while crossing the street to reach his stopped and waiting school bus, which had activated its emergency signaling equipment and stop arm. The Virginia court concluded that use of a school bus includes the loading and unloading processes while the bus was parked with its flashing lights activated. ***Id***. at 352. The Virginia court stated:

> Thus, under the facts now before us, we conclude that Johnny was using the school bus as a vehicle at the time he was injured, based on his use of the bus' specialized safety equipment and his immediate intent to become a passenger in the bus. Those facts establish the required causal relationship between the accident and Johnny's use of the bus as a vehicle.

***Id.***

¶38. In ***State Farm Mut. Auto. Ins. Co. v. Kentucky Sch. Bd. Ins. Trust***, 851 F. Supp. 835 (E.D. Ky. 1994), the federal district court stated:

> Use of the vehicle in question, a school bus, includes transportation of children to and from such school and the unloading of the school bus and that such unloading encompasses not only depositing them outside the bus but assuring that they reach a place of safety which, as in this case, may include crossing a street.

***State Farm Mut. Auto. Ins. Co.***, 851 F. Supp. at 838.

¶39. The court determined that coverage existed when the child was struck while crossing the road to reach the parked school bus. ***Id***. at 838. The court stated:

> Given Kentucky's liberal interpretation of the phrase "arising from the operation, maintenance or use" of a vehicle Stephan Eric Coleman's death was covered by the State Farm policy under Kentucky law. The undisputed facts show that the school bus was stopped with its flashing yellow and amber lights when Stephan was crossing the road in front of the bus and hit by the oncoming truck. Although Coleman was physically outside the confines of the bus, he had not yet reached a point of safety across the street. Undoubtedly, the purpose of the school bus's flashing lights and the law requiring oncoming vehicles to stop while the bus is unloading is to allow students to safely cross the street or road upon exiting the bus. Had the bus not been stopped and waiting to ensure that the child made it safely across the street, the outcome may have been different. In this action, though, the bus was waiting with flashing lights and an extended stop sign, waiting for the child to reach the other side of the road safely. Therefore, the bus was still in "use" under the terms of the State Farm policy.

***Id***.

¶40. Finally, Coregis points out a case from Kentucky. In ***Hartford Ins. Cos. v. Kentucky Sch. Bds. Ins. Trust***, 17 S.W.3d 525 (Ky. Ct. App. 1999), the court determined that the child was still using the bus when struck stating:

> The circuit court correctly applied the holding in ***State Farm Mut. Auto. Ins. Co. v. KSBIT***, ***Supra***, and cases from other jurisdictions which applied similar rules. The holding in these cases pursuant to the applicable motor vehicle insurance policies that a child is still 'using' a school bus after disembarking as long as he or she is crossing the street under the protection of the bus's warning lights

and stop arm, and until he or she has reached a place of safety such as on the opposite curb, are sound legally and as a matter of public policy.

*Hartford Ins. Co.*, 17 S.W.3d at 529.

¶41. The Mississippi Legislature created a "zone of protection" to protect children when loading and unloading a school bus. Miss. Code Ann. § 63-3-615 (1996) provides:

(1) The driver of a vehicle upon a street or highway upon meeting or overtaking any school bus which has stopped on the street or highway for the purpose of receiving or discharging any school children shall come to a complete stop and shall not proceed until the children have crossed the street or highway and the school bus has proceeded in the direction it was going.

(2) Any person violating the provisions of subsection (1) of this section shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than Two Hundred Dollars ($200.00) nor more than Five Hundred Dollars ($500.00), or imprisoned for not more than one (1) year, or both.

(3) This section shall be applicable only in the event the school bus shall bear upon the front and rear thereon a plainly visible sight containing the words "school bus" in letters not less than four (4) inches in height.

¶42. Miss. Code Ann. § 83-11-103(b) (1999) defines an "insured" as follows:

The term "insured" shall mean the named insured and, while resident of the same household, the spouse of any such named insured and relatives of either, while in a motor vehicle or otherwise, and any person who uses, with the consent, expressed or implied, of the named insured, the motor vehicle to which the policy applies, and a guest in such motor vehicle to which the policy applies, or the personal representative of any of the above. The definition of the term "insured" given in this section shall apply only to the uninsured motorist portion of the policy

¶43. In *Johnson*, this Court interpreted Miss. Code Ann. § 83-11-103(b) as follows:

The statute thus grants 'insured' status to any party who 'uses' the covered vehicle with the consent of the named insured. This Court has, in prior cases, set forth a very liberal interpretation of 'using' a vehicle, and this interpretation has even included actions taken outside of the vehicle itself.

*Johnson*, 726 So.2d at 168.

¶44. However, this Court in *Johnson* did not draw artificial and arbitrary distinctions as to what constitutes "use" in all cases. *Id*. at 169. The courts are left with the "difficulty of proving use of a covered vehicle" by establishing reasonable parameters. *Id*. The theory of use advanced by the Children in the case at hand creates an unreasonable parameter of coverage. The trial court did not err in determining that the Children did not satisfy the requirement of use of the school bus in order to be entitled to coverage under the underinsured motorist policy. The trial court determined that there could not have been any "close spacial proximity to the insured vehicle" and the Children could not have been preparing to board a school bus not even in sight. This issue is without merit. We find that there was no coverage. Therefore, we determine that coverage was not available, the issue raised on appeal by the Children as to "stacking" of the underinsured

policies will not be addressed.

## CONCLUSION

¶45. The Children waiting at the bus stop alone did not constitute use of the school bus to trigger underinsured motorist coverage under the Coregis insurance policy. Therefore, the judgment of the trial court is affirmed.

¶46. **AFFIRMED**.

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITHOUT SEPARATE OPINION.**